SUPREME COURT. Monroe General Term, September, 1858. *John-son, Welles* and *Smith*, Justices.

## IRA STOUT, plaintiff in error, *v.* THE PEOPLE, defendants in error.

To sustain a challenge for *principal cause*, on the ground that the juror has formed and expressed an opinion, it must appear that the opinion was absolute, unconditional, definite and settled; it is not enough that it was hypothetical, conditional, indefinite and uncertain. If the opinion belong to the latter class, it is a proper subject for a challenge *to the favor*.

Where, on a trial for murder, a juror who was drawn was challenged by the prisoner for principal cause, on the ground that he had formed and expressed an opinion, and such challenge was traversed by the public prosecutor, and it appeared by the testimony of the juror, who was called upon as a witness to prove the truth of the challenge, that he thought he had an impression as to the prisoner's guilt or innocence; that he rather thought he had formed an opinion; that he presumed he had expressed it, and thought he retained it; that he had formed an opinion, if the newspaper accounts of the transaction, of which he had read only a part, were true, and that so far as he read he gave them credence; that it might or might not require evidence to remove his impression of the prisoner's guilt; that he had not arrived at any definite opinion, and the court overruled the challenge, and decided the juror to be competent, it was held on review that the decision was correct.

In all challenges for principal cause and for favor, the matter of fact upon which the challenge is founded must be specified when the challenge is interposed, or the court should disregard it. Such matter of fact may be traversed, presenting a question of fact for decision, or the party may demur, thus admitting the truth of the allegation.

It is most convenient for the dispatch of business, and in accordance with the customary practice at the Circuit and Oyer and Terminer, that a challenge for principal cause, resting upon a disputed question of fact, should be decided by the court, though such a question may, like a challenge for favor, be referred to triers for determination; and when such a question has been determined by the court, without objection from either party, the court will be deemed to have acted by the consent of counsel on both sides, and its right thus to act cannot afterwards be questioned. Per SMITH, J.

On a trial for felony, it is not a valid objection to evidence by the prosecution of a fact otherwise competent, that it would tend to prove the prisoner guilty of a distinct and different felony.

The prisoner and his sister, Mrs. L., were indicted for the murder of L. On the separate trial of the prisoner, evidence was given tending strongly to show that the prisoner and Mrs. L. were both present at the homicide, and that it was the result of a violent struggle, in which all three were in some way

The People *v.* Stout.

engaged; that the deceased had been jealous of his wife; that they had lived unhappily together, and had quarrelled, and had partially separated; and that she had applied to an attorney to procure a divorce from her husband. The prosecution then offered evidence tending to show an incestuous connection between the prisoner and Mrs. L. during the few months immediately preceding the homicide: *Held*, that such evidence was competent on the question of motive.

THIS case came before the general term on a writ of error to the Monroe Oyer and Terminer, in which court the prisoner, together with Sarah Littles, his sister, had been indicted for the murder of Charles W. Littles.

The prisoner was tried separately on the indictment, at the Monroe Oyer and Terminer at Rochester, on the 14th of April, 1858, before *Henry Welles*, justice of the Supreme Court, *George G. Munger*, county judge, and *Ephraim Goss* and *James Swayne*, justices of the Sessions. (*a*)

In proceeding to empannel a jury to try the prisoner,

*Johnson M. Tower* was drawn and called as a juror, and was challenged by the prisoner for principal cause, on the ground that he had formed and expressed an opinion touching the guilt of the prisoner, and the district attorney traversed the challenge. The juror being sworn and examined as a witness on behalf of the prisoner, testified: I have read part of the accounts of the transaction in the newspapers; I think I have an impression as to the defendant's guilt or innocence; I rather think I have formed an opinion; I presume I have expressed it; I think I retain it.

*On his cross-examination, he testified:* I formed an opinion if the accounts were true; I rather thought that they were true; so far as I read I gave them credence.

*On his re-direct examination, he testified:* I rather think I believed the accounts true; it might or it might not require evidence to remove my impression of the defendant's guilt.

*To the court:* I did not arrive at a definite opinion. The court thereupon overruled the challenge, and the prisoner

(*a*) The opinion of the Oyer and Terminer, upon an interesting question which arose on the trial, will be found in 3 *Park. Crim. Rep.*, 670.

The People *v.* Stout.

excepted. The juror was then challenged for favor, and after evidence offered to them, arguments of counsel, and charge by the court, the triers found the juror indifferent, and he was sworn as a juror, and sat as such during the trial.

After a jury was empanneled, the district attorney called on the part of the prosecution, *John Quin* as a witness, who, being sworn, testified as follows : I was coroner of this county during the month of December last; I held an inquest on the body of Charles W. Littles, commencing the 20th of December last, Sunday morning ; I found the body in the Genesee river, near what is called Sharpe's Quarry, on the bank of the river. The quarry is on the hill excavated out of the solid rock. There is an alley leading from St. Paul street to the bank of the river passing the quarry. The alley runs a little north of west. The quarry is on the north side of the alley, on the top of the bank. On the bank south of the alley there was an elevated piece of ground, triangular in shape, at the east end, six or seven feet higher than the alley, at the edge of the river bank eighteen or twenty feet higher than the alley. The alley there is a mere roadway the width of a wagon. The triangular plat is very nearly level; the difference in height is made by the descent of the roadway. The plat is a grass plat. I have never measured it. I should judge that on the south line and north line it was very nearly equal, perhaps the south line sixty feet and the north line eighty feet long. There was a fence on the south line. The river line I should judge to be about forty feet. The fence was fastened to a tree which stood on the edge of the bank ; the fence projected over the edge of the bank five or six feet; the tree projected out, and to that the fence was nailed. The bank became more naked and destitute of shrubbery as it went northward. Below there was a little elevation or knoll which appeared to be the droppings of the bank; it was grassed over considerable. I undertook to measure the perpendicular distance once, and called it thirty feet. The knoll might be three feet high. The perpendicular distance from the grass plat to the base of the knoll, I called thirty feet. A few feet at the top edge of the bank there is a

steep slope—too steep to stand on. From the knoll down is very rough, and it is very steep; it is rugged and rough with rocks to the river's edge. When the river is low I should think it is one hundred and eighty or two hundred feet to the water. When high the water rises perhaps twenty feet upon the bank. It is sixty or seventy degrees steep. There is a large rock about half way down the bank, and the bank is steeper from the rock upward than from the rock down towards the water's edge. Its appearance at the time was dry, with some shrubbery, burdocks, stones, and some grass. It is a ragged and rough surface, the whole of it. The river was then very high. The body was in the water, in sufficient depth of water to float it. From the water's edge there is a foot-path up to the top of the bank, made by people carrying flood-wood. It begins near where the body was found, and comes out at the top of the bank two hundred feet northward from the tree; it comes up into the bottom of the quarry. The body lay with the head down stream; he was dead; it appeared water-washed a good deal; his clothes were buttoned up high, overcoat, undercoat and vest; the coat was buttoned clear up to the chin; he had boots on; standing on the shore you could see that the skull was broken; it had two wounds on the top of the forehead; a part of the skull was gone, perhaps an inch and three-quarters square was gone; I afterwards found a piece of the skull on the steep slope between the rock and the little knoll. There was a track from the base of the knoll, in a zig-zag course, down the bank to the flat rock, as though something had been dragged along; there was blood on the rock; there appeared to be a good deal, and you could see where it ran off on the edge of the rock on to the ground; there was some blood from the base of the knoll to the rock, but not so much; from the rock to the water, or to within about ten feet of the water, the track continued, and there was another pool of blood; there was nothing from this pool of blood to the river; the shore was pebbles; the grass and stuff through the track was broken down and flattened; there was blood on the top of the grass plat; the first spot was very near where you ascend from the alley way to

the grass plat; after you get up, it was ten feet from the steps where people stepped up, and might be three or four feet from the north edge of the bank; there was a large pool of blood there, as though there might be a quart of blood there; there was a track of a heel of a boot in the blood, and also the arm of a chair; there was a track or trail from that leading towards the fence and towards the river bank; there was another pool of blood midway between the first pool and the river bank; this appeared to be more scattering than the other; I picked up the chair arm, and have it now; the track shows visibly from where the first pool of blood was to the face of the bank near to the tree, and close to the fence; it was continuous from the first blood spot to the second, and on to the edge of the bank; the fence was a tight board fence, six feet high. ·

I was at the place about half-past seven in the morning of the 20th December; the body was brought by me to the police office; the body had on, among other things, a dagger in a pocket in the inside of the under-coat.

On his *cross-examination* by prisoner's counsel, he testified: There were people walking on the grass plat at the time I examined it; on the grass plat on the morning in question; I have described all the marks visible, except some indentations in the fence, which looked as though made by a stone. The marks were made by a stone about one-quarter of an inch in depth; I do not know whether the wood looked newly broke or not; I did not see any stones on the grass plat; most of the marks were between the pools of blood; could not have been far from the first pool of blood.

*Henry P. Hapgood*, sworn for the People, testified: I knew Charles W. Littles; the time he was found dead was the morning of the 20th December, 1857, on the edge of the river opposite the north line of the Falls Field; when I went down there I found no one present except Mr. Quin; I looked at the general appearance of the ground from the shore to the large flat rock; the ground was composed of stones, and they were covered with blood from the edge of the river to this rock; I examined the flat rock and saw that there was a large quantity

of blood on it; I then went upon the grass plat, at the east end near the fence; there was a path up there which appeared to have been used quite frequently; I should think it was not very difficult to ascend; when I got up there I found two pools of blood on the grass; the west pool about seven feet from the fence and forty feet from the brink; the other was five or six feet east of that, and a little nigher the fence, and I should think ten or twelve feet from where I went up, and some three or four feet from the edge of the bank; this grass plat is seven, eight or nine feet higher than the roadway directly opposite the east blood mark.

The prosecution offered further evidence describing the grass plat, the blood spots thereon, the track or depression of the grass leading from the pools of blood to the brink of the precipice, and introduced, in evidence, a map of that part of the city of Rochester, containing the place of the homicide, and the streets leading therefrom to the house of defendant on Monroe street, which distance is about two miles.

*Dr. Avery* and *Dr. Harvey F. Montgomery*, were then called, and testified, that they made a post-mortem examination of the body of Charles W. Littles on the forenoon of 20th of December, and they produced the skull cap of said Littles, and described the appearance of the wounds on the head to be several fractures on the skull and wounds on the scalp of a peculiar nature, one of which, they both testified, would have immediately produced death. They gave it as their professional opinion that these wounds were produced by more than one heavy blow, which blows appeared to have been given perpendicular to the skull at the place of the fracture. They also described several slight abrasions of the skin on other parts of the deceased's body.

*Jane Stout*, called and sworn for the People, testified: I know the prisoner; am a sister-in-law of his, the wife of Eli Stout; Eli Stout is prisoner's brother; Mrs. Sarah Littles is a sister of the prisoner; I have known the defendant about four years; he resided in Owego about four years ago; he came to Rochester to live about July or August last. [It was here con-

The People *v.* Stout.

ceded by the defendant that he was absent from the family during five years prior to July last, and did not see any of them.] I knew Charles W. Littles; I have known him about four years; three years ago this April he married Sarah; in December last the family resided at No. 75 Monroe street; after the marriage of Littles with Sarah, he resided with our family from April, when they were married, until the latter part of summer; he and his wife then went from our house to Mrs. Cunnington's boarding house on Main street; I don't know how long they remained there; I think they stayed there all winter; he sent his wife to Dansville twice while they were boarding at Mrs. Cunnington's; after they came back from Dansville they resided with the family; they resided there two or three months after I came home; we moved then on to Andrews street; Mr. and Mrs. Littles then lived with the family; Littles was sick there two or three weeks; this was last summer; the family moved on Andrews street in the spring, and moved from there on to Monroe street last fall; they moved to Monroe street I think in August, and remained there until through December; Littles did not come to the Monroe Street House to stay all the time as he did before; Mrs. Littles lived there during that time from August to December; I remember the 19th of December last; on the morning of that day all the family were at the house; Mrs. Margaret Stout, Ira, Eli, Sarah Littles, Frances, Charles, Mr. Littles, and myself; I believe mother, Eli, Ira and myself took breakfast together; Mr. and Mrs. Littles afterwards took a cup of coffee; I was not at home all that day; I went away in the afternoon about half past two, and returned about six in the evening; I can't say how late Ira left that morning; I saw him that morning about eight; I do not know when Littles left; I was at home at noon; Ira was not at home; Sarah was there; after seeing Ira about eight o'clock in the morning, I next saw him in the afternoon at the house before I went down into the city; mother was there then, Frances, Mrs. Littles and myself; I next saw him after that at the tea-table on my return from down town; Frances, Charles, Mrs. Margaret Stout, Ira, Eli and myself took tea there; I

had not seen Littles from the time he left in the morning; we took tea about six o'clock; I cannot tell who left the table first; I did not notice when Mrs. Littles left the table; I did not see her after she left the table; I saw Ira after he left the table; I don't know where he went; he went and got a shawl; he went into another room to get the shawl; I saw him in the kitchen after he went into that room; he left the house after six, perhaps half-past six; nobody left with him that I know of; he left after Mrs. Littles left the tea-table; I left the house that night with my husband; we went to the Glass Blowers, on the corner of Fitzhugh street; we got home before ten; when I got home I found mother and Franky and my baby; they were in the kitchen; I remained there awhile and then went out into an adjoining street; I don't know how far I went. The witness then testified that she met Ira and Sarah on Union street going towards the house. I was absent from the house about twenty minutes; when I returned I went through the front door and hall and sitting-room into the kitchen; mother was in the kitchen when I went in; I found mother there, also Eli; my husband and I then went to bed; we went to bed in the room over the sitting-room; I had never slept there before; it was Ira's room; our room was over the front room; our little girl did not go with us just then; she went up afterwards; mother brought her up some time afterward; my husband and I got up when we were called; we went down into the kitchen, and found there mother and Ira and Sarah; when I first went into the room Ira was lying down on the floor; I don't know whether Sarah was standing up or sitting down; Eli went after the doctor; it was a little while before he started; there were a few scratches on Ira's face—the skin was torn; his right arm was hurt; he thought his arm was broken; I saw his arm afterwards; it was broken between his shoulder and the elbow; I don't know whether he had his boots on; when I first saw him he had his two coats on; they were taken off by the doctor and Eli; Ira felt sick and faint.

*Q.* Did you see any marks upon Mrs. Littles? Objected to by prisoner's counsel; objection overruled, and prisoner excepted.

The People *v.* Stout.

*A.* I noticed Mrs. Littles' face; it was bruised some; her face was black and blue on the nose; I think the skin was torn; it seemed to me on both sides of the nose ; she showed me her hand, and I saw it was swollen—her left hand I believe; I did not notice any blood on her clothes; Dr. Rapalje came first about twelve o'clock; he went away and got another doctor; Dr. Whitbeck came with Dr. Rapalje the second time; they set Ira's arm ; Ira did not say how the injury happened to him; I don't remember that he at any time said how the injury happened; I only remember of Ira saying that he felt very bad, and that he thought his arm was broken; I think Ira said he could not get up, for he was faint; I asked him how it occurred; don't recollect that he made any answer; I asked Sarah, and she told me; we were all together; I did not hear Ira say anything that night but what I have stated.

*Q.* Did you say to Ira that you met him on Union street, and he replied yes, I know it?   Question objected to by prisoner's counsel; question allowed, and prisoner excepted.

*A.* It seems to me that I remember that; I think he did tell me that he fell on Galusha street; I went to bed again about half past three or four; Eli went to bed right after the doctor came.

*Q.* What had Mrs. Littles on when you came into the room ? Question objected to by the prisoner's counsel; objection overruled, and prisoner excepted.

*A.* A black satin skirt; I don't know what waist she had on ; I had not heard Ira saying anything about Mrs. Littles going away ; I think I heard Mrs. Littles and Ira talking about her going west; Mr. and Mrs. Littles had lived apart considerable; they separated more than once ; I only know that they separated more than once ; this was when they lived on Andrews street; Littles did not live at the house on Monroe street previous to the 19th of December; he stayed there some; he was there a good deal of the time; he used to come there and stay ; I believe that he stayed there the night previous to the 19th; he and Mrs. Littles occupied the front room ; he used to stay there the biggest part of the time; used to come afternoons;

when we first moved there he didn't use to stay there nights at all; there were difficulties between Mr. and Mrs. Littles; it commenced when he was sick on Andrews street; Littles got mad at her and took her watch away.

*Q.* Do you know of her going to Mr. Trimmer's office? Question objected to. District Attorney states that he intends to show that she went to inaugurate proceedings for a divorce. Objection overruled, and prisoner excepted.

*A.* She did, to see about getting a divorce; it was last June; I went with her; Mr. Trimmer is a lawyer; she found that she couldn't get one; sometimes Mr. and Mrs. Littles were friendly, and sometimes not; they always talked with each other; I have heard Mrs. Littles speak to Ira of her difficulties with her husband; there is a front hall in the house leading from front door to middle room; there is a bedroom off the middle room; mother, Frances and Charley occupied that room; my husband's room and mine was over the parlor or front room; the room we slept in the night of the 19th was over the middle or sitting-room; there was a bed in the lower front room or parlor; Mrs. Littles occupied that; defendant's room was over the sitting-room where I was that night; I believe Mr. Littles slept with Sarah when he was at the house; believe I never saw Ira in bed in other rooms than his own; saw him in bed, the morning he was hurt, down stairs in the sitting-room; the bed had been removed from the parlor to that room.

*Q.* Do you know whether Ira and Mrs. Littles ever slept together?

Question objected to by prisoner's counsel. Objection overruled, and prisoner excepted.

*A.* I don't wish to answer. The Court.—You must answer.

*A.* I never saw them sleep together.

*Q.* Did you ever see them in bed together? (The answers to these questions were taken subject to the last objection.) I have seen them on the bed together. Question repeated. *A.* I have seen them in bed together; I don't know how often; not a quarter of the time; two or three times; I don't know that they slept together all night, and don't know that they

The People *v.* Stout.

slept; I never saw them in bed together except in one bed— the bed down stairs in the front room.

On her *cross-examination* by prisoner's counsel, she testified: Mr. and Mrs. Littles were married three years ago this month; the family was then living on North Clinton street; after they were married they first lived with us; they immediately began to live with the family; in August next they went to board at Mrs. Cunnington's, and remained there four or six months; Mrs. Littles then went to Dansville to visit her husband's parents; she came back and Littles and she went again; her first visit was three or four weeks; when she returned she went to Mrs. Cunnington's; Mr. Littles was there; he stayed there while his wife was in Dansville; they remained in Dansville four or five months; I believe it was in the next fall they came back; I was not here at the time; I was in Owego; I returned in February, a year ago last February; when I came home Mr. and Mrs. Littles were living with the family on Water street; my husband and I went there to live, and the whole family was then living together; we moved from there on to Andrews street, and Mr. and Mrs. Littles went there; the family lived there until last August, and then moved to the house on Monroe street; Mr. and Mrs. Littles lived with the family on Andrews street most of the time; she lived there all the time during that summer; that was his general place of sleeping and taking his meals; he generally took his meals with the family; he and his wife occupied the same room; he was sick during the time on Andrews street, for three, or four weeks; was confined to his bed most of the time; Mrs. Littles was there at the time, and nursed, and watched and attended him; she was with him almost constantly; the disease was of a private nature; it was a venereal disease; it was after that that he left the house; we were living on Andrews street when Ira came home; as near as I can recollect it was in the latter part of July; Ira then came to live with the family; he lived there till we moved on Monroe street; after Ira came back, Mr. Littles' connection with the family continued; Ira went with the family when they moved to Monroe street; Mr.

Littles did not go with the family when they went to Monroe street; he did not come there to board and live as he used to do; he came, however, quite often; was there most of the time; it was a month before the 19th of December that he began to come quite often; he used to come most every day; he frequently took meals there, and sometimes slept there; the first two or three weeks we were on Monroe street, he did not come at all; after that he came quite often; I think that during the last month he slept there perhaps four nights in the week; when he was there he and his wife occupied the same room; Ira was then in the family; he was then attending Eastman's Commercial College; Ira and Mr. Littles had met at our house; they associated together considerably; I have seen them together almost every day; their intercourse was friendly; I never saw any difficulty or disturbance between them; they would come and go from the house together; I have seen them talking together in the house; I saw Ira and Sarah in bed together, first time, in the morning, on Monroe street, right after we moved up to that house; believe I did not see them in bed together except immediately after we moved up there; they were not in the bed together the last time; I was sitting in the room; Sarah was lying on the bed reading, and Ira was lying across the foot of the bed; saw them in bed together once after that, quite a little while; it was down stairs in the front room; they were in the bed; it was in the morning; didn't notice whether they were undressed; I suppose I have seen them in bed together at other times; once after that I remember; I remember three times; the last time was in the evening early; when Ira and Sarah were in bed together it was known to the whole family; don't know that Littles knew it.

*On re-direct examination,* witness testified: I don't know that I testified before the coroner that I saw Ira and Sarah in bed together within a month; I may have seen them in bed together within a month of the time of the coroner's jury; I should think it might be; I heard defendant's mother speak to him once or twice about sleeping with Sarah; she told him he

The People *v.* Stout.

ought not to do it; I saw Mrs. Littles' victorine at the police office; also her basque and satin skirt.

*Margaret Stout*, called and sworn as a witness for the People, testified: I reside in the city, and have for five years past; I am the mother of the prisoner, and of Eli, Mrs. Littles, and two other children: Ira came here last August; Sarah married Mr. Littles three years ago; we were living on Andrews street when Ira came home; Mr. Littles came right to our house on his marriage, and lived until July; he then went on to Main street to Mrs. Cunnington's; he and Sarah boarded there; they after that went to Dansville; then she came home from there before Mr. Littles; he came four or six weeks afterwards; when Mr. Littles came home, they stayed with me until along in June last; after that she stayed with me and he went away; he would be gone a day or two and then come back; he would come back every day or two, and sometimes once in two or three days; he has never regularly boarded with me since; Sarah remained with me always since; it would'nt be more than a day or so that Littles would not come to the house; last November and December he would come about every night and stay all night; during the week previous to the 19th of December, I think Mr. Littles was at the house every night and stayed all night; Mrs. Littles and he occupied the same room; he stayed there the Friday night before the 19th of December last, and occupied the same room with his wife; I think he took a cup of coffee the Saturday morning; he left that morning about 8 o'clock; Eli went early; Ira went before 8; Ira returned after his school was out, about 2 in the afternoon; he did not generally come home until evening; when he came home there was Jane and Frances, myself and Mrs. Littles; Jane went down street; Sarah that afternoon sewed up a pair of cloth gaiters, and then she sewed up a pair of gentleman's slippers; Ira went down street and got me some buckwheat flour; he was gone an hour or an hour and a half and then he went down again and got me some groceries; he did'nt get back until most tea time; I think Ira and Sarah were in the middle room together about half an hour, but per,

haps less; it was after he went after the flour; all my family took tea that evening at, I think, about 6 o'clock; Sarah left the tea table first; she went into the front room, dressed herself, and went down to the city; she had on a pink bonnet and black satin skirt, and a broadcloth basque, and a victorine, and a cameo breastpin; she left first; went out alone; Ira left a little before seven; he had on a black undercoat and brown overcoat, and an oilcloth cap; I guess he had on his spectacles; he generally wore them; he went out the same door that Sarah did—the front door; he lived with me ever since he came to Rochester; Eli and Jane went to the Glass Blowers a little after seven; Eli and Jane got home about 10; I did not know when Ira and Sarah got home; I should think it was between half-past 10 and 11 when I first knew Ira was at home; I did not hear them come in; when I first saw them they were in the front room; they were lying on the bed; there was no light; she called for a light, and I took one; Sarah took it and came out into the kitchen; she was not undressed; Ira was not undressed; she then told me that Ira broke his arm; Ira then came out and sat down in a chair; Ira said he was faint, and I took him and laid him down on the floor; I took hold his hand; he said his arm was broken; I told him that we would have to have the doctor and have it set; he said I should wait a few minutes until he felt better; I then went and made some splinters; I then made a fire, and got in the sofa into the kitchen; I then got him on to the sofa; I then called Eli, and he came down and went for the doctor; Jane also came down; Dr. Rapalje then came, and said he could not set it alone, and they went after another; Ira then asked me to go down on the Falls Field and get his cap; I told him that I had never been down there, and that I dare not go down there; he then asked me if Charles wouldn't go; I went and called Charles up; I called him up about half-past five; I went down to the Falls Field with him; the gas lamps in the streets were lighted when we went down; when I went down I went on the hill and came back, and Charles went down the path; I turned and came away as Charles started to go down the

The People *v.* Stout.

bank; Charles overtook me before I got home; he had Ira's cap and Sarah's breastpin; when we got home we found Sarah and Ira in the kitchen; that was all that was up; Charles brought the cap and pin home, and I hung up the cap, and Sarah put the pin in her pocket; Charles said he had found the cap and pin, and I don't remember that Ira said anything; Charles said he found the cap and pin under the hill at the Falls Field; it was the same cap that Ira wore when he went away that evening; before we went down Ira said he lost his glasses; Charles told him after he got back that he did not find them; Charles said that they had found a man down there that was drowned the day before; Ira did not make any answer; pretty soon a man came and said before us all that they had found Mr. Littles down the river; I don't remember as Ira said anything; then the officers came, and we all went down to the police office; before going to the Falls Field, Sarah spoke of getting the pin; she either told me or Charley; it was at the same time that Ira told me to get the cap; when Ira told me to get the cap, he said that it would be found down under the Falls Field; Sarah said her pin had broken off there where she fell. [Here a pair of spectacles and cameo breastpin, found at the base of the precipice below Falls Field, were shown to the witness, who said the pin was Sarah's, and she thought the spectacles were Ira's.] When Ira came home I did not see anything the matter with him, except that his arm was broken; there may have been a little scratch on the face; Sarah was bruised pretty badly on her leg and face, one of her arms was hurt pretty much, and she said it was broken; Ira's right arm, and Sarah's left arm was broken; I do not remember anything about Ira's pantaloons; did not notice that his clothes had blood on; Sarah had some on her basque and on her clothes; she fetched her basque to me and wanted I should clean it off; I cleaned off a couple of spots, and then told her to hang it away until after breakfast, and then I would fix it; when they first came home I asked Ira how he hurt him, and he said he fell on Galusha street; he said they were walking pretty fast, and they slipped and fell, and Sarah fell over him;

Sarah and her husband did'nt live very agreeably together part of the time; Sarah and he separated as much as three times; when they first separated they lived on Main street; the second time was when she came home from Dansville, and the third time was when they lived on Andrews street; I think that Sarah told Ira of her difficulties; we talked of it a good deal in the family; Ira was present; Ira said she ought to overlook his faults and live with him; this was when he first came home, and sometime after that, Ira said that he thought Littles used Sarah "real mean;" Littles and Sarah slept in the front room of the house on Monroe street; Eli and his wife slept in the front room up stairs; Charles and Frances slept with me in room off the sitting room; Ira in the back chamber, and Mrs. Littles in the front room below.

*Q.* Did Ira and Sarah sleep in any other way than you have named? Question objected to by prisoner's counsel. Objection overruled, and prisoner excepted.

*A.* They used to sleep together once in a while; I don't think they did but once or twice without the children were with them; sometimes up stairs they and the children all slept together, and sometimes below; Littles knew that they slept together once, and I don't know but always; he never said anything about it as I know of; he saw them in together once; he took Sarah out of the bed and brought her into the kitchen once; I told Ira they ought not to sleep together—it did not look well, and people might talk about it; the night Ira and Sarah were hurt, I asked him how he came to go down to Falls Field, and he said they took a walk down there, and fell off; he said they both fell off; I don't remember whether he said they both fell off together.

On her *cross-examination* by prisoner's counsel, she testified: I have seen Ira and Sarah in bed together only twice without the children; once was just after we moved to the Monroe street house, before the beds were put up, and we all slept on the floor in our room; the other time was once that Ira had sat up very late one night writing, and Sarah called to him to come get into bed with her, as Charles had not yet come home;

the next morning Mr. Littles found them there; he came home between six and seven in the morning, and took Sarah up and brought her into the kitchen; when Ira got up he took Sarah back and went to bed with her; Ira got up immediately; Littles did not appear angry; I never heard him blame Ira for it; after Ira and Sarah got home that night, they didn't either of them say anything about Mr. Littles; that afternoon Ira and Sarah were in the middle room but a little while—a very few minutes; there was no fire in that room; there was a stove, but it was not put up; I was in the kitchen.

The witness then testified as to the relations between Mr. and Mrs. Littles during their married life, and it appeared that the cause of their difficulties was Littles' association with bad women, and leaving of his wife, and that he had twice had a venereal disease, the last time the last summer when the family resided on Andrews street, and that then Mrs. Littles watched over and tended him. She also testified that Mr. Littles was very jealous of his wife; that he was angry when other men walked with her, or rode with her, or paid her any attention; that he was particularly angry with a certain person with whom she sometimes walked and rode, and made threats against him. Also, that the last time Mr. Littles was at her house, was on the morning of the 19th of December. She also identified a quantity of clothing shown to her as being that of Ira and Mrs. Littles, which she had described as having been worn by them that night. This clothing was shown to the jury.

*Charles Stout* was then called and sworn for the prosecution. His testimony described his and his mother's going down to the Falls Field at Ira's and Mrs. Littles' request, and getting the cap and breastpin from under the cliff. It did not materially differ from that of Mrs. Margaret Stout, and corroborated it.

*William C. Storrs*, sworn for the prosecution, testified: That burdock burrs were found on the clothes of Ira Stout and Mrs. Littles, which they had on the night of the homicide, and also that the chair arm found at Falls Field was one from Littles'

office; he also described Galusha street as not a place where a dangerous fall could be had; also spoke of blood and burdocks on the clothes and in Mrs. Littles' hair; also, on cross-examination, spoke favorably of the character of deceased; that he saw him in the office about five o'clock of the afternoon of the homicide, &c.

The district attorney then called other witnesses, who described the scene of the homicide the morning of its discovery; but their testimony did not materially differ from that of John Quin.

*Henry Hunter* testified: That he was a lawyer; that Littles occupied the front room in his office; that Ira and Sarah used frequently to come to his office, until within about a month previous to the homicide, when they did not come so often; then about once a week, or once in two weeks; they came about tea time or a little after; Littles was there; had also seen them and others of the family in the streets together, at concerts, &c. This witness particularly described the place of the homicide.

*Samuel M. Sherman* was sworn for the prosecution, and testified: I went to the house, 75 Monroe street, the Sunday morning Mr. Littles' body was found; Ira lay in the bed; I asked him when he hurt his arm; he said night before last; I asked him where; he said on Galusha street; I understood him to say he was getting over a wall and fell about ten feet; I asked him if he knew Littles was killed; his reply was, perhaps he would not be found, or he thought he would not be found; I told him they had found him; he said nothing in reply to that; Bradshaw brought out his boots, which were wet; I asked him how his boots came wet; and he said he washed them every night; I saw his coat, cap and pantaloons; think there were burdock burrs on the brown coat, and spots of blood on one of the coats; I found in the bedroom a black basque; it was wet on one side; the pants looked as if they had been wet on the bottom and part way up; found a pair of lady's drawers on the bed; there was blood on them on the bottom; these things were all taken to the police office.

The People *v.* Stout.

*William D. Oviatt*, sworn, testified: Was chief of police in December last; went to the house on Monroe street, on Sunday, the 20th, in the forenoon; I told Ira he had got to go to the police office: he said there was no need of it; said he could not go without a carriage; I sent for a carriage and took him down; I asked him how he hurt himself; said he fell on Galusha street—fell about ten feet; I asked him if he had heard that Littles was found; he said he guessed it was not so; when I got to the police office I asked Ira to look at the corpse, and he said it was the body of Littles. This witness also testified about the burdock burrs on the clothing, and that he cut some from Mrs. Littles' hair.

*Bornabus Wright*, being sworn, testified: I reside in this city; I knew Mr. Littles well; recollect Saturday, December 19th; saw Littles last alive between seven and eight o'clock that evening, at the New England House, on Main street; he was there about ten minutes; I conversed with him about that length of time; when he came in he said he had been to the barber shop; the barber shop was the next room of the house; he looked as though he had just been shaved; he looked very well; when he went out he said he was going to the office.

*William S. Mackey*, sworn, testified: I keep a music and jewelry store on State street; I know Mrs. Littles; she called at my store a few days or a week before December 19th, and wanted to sell her watch; the watch was left to be sold; on the evening of December 19th, she came between six and seven o'clock and got the watch.

*Mary Farrell* was called and sworn for the prosecution, and testified: I reside at No. 66 State street; I know Mrs. Littles; have known her for two years; Mrs. Littles was at my place the same night that Littles was killed; she came about seven, and stayed until eight, or half-past eight. Witness then described her clothing. She did not do anything while she was there, but simply called in and stopped; she came and went alone.

On her *cross-examination* she testified: While there she went

to the glass and smoothed her hair; she appeared quite cheerful; talked as usual.

*Sarah Cunnington* was called, sworn for the prosecution, and testified: I reside at 101 Main street; I know Mr. and Mrs. Littles; they boarded with me at one time; Mrs. Littles was at my house the Thursday night previous to the 19th of December; her husband was not there; she stayed there all night; on Friday morning her brother Ira came about eight, or half-past eight; he brought her a pair of rubbers; I couldn't say how long he stayed; I went out of the room and did not notice; Mrs. Littles had bought a new dress, and asked Ira to go in and see it; I went in too; my little daughter Georgiana was there; I left them in the parlor; I don't know when they left.

*Georgiana Cunnington,* was called and sworn as a witness for the prosecution, and testified: I was nine years old last February; I know Mrs. Littles and Ira Stout; I recollect hearing that Mr. Littles was killed; before that time Mrs. Littles was at our house; she stayed Thursday night all night; in the morning Ira came; I saw him in the parlor; I was sitting on the piano stool; I was playing the piano; I recollect Mrs Littles showing a new dress; I don't know how long he stayed— think half an hour; before he went away he told her to go down on St. Paul street, and he would go around by the post office and meet her; Ira went out of the house first; I don't know how long after Mrs. Littles went; perhaps about a quarter of an hour afterwards.

*Alonzo W. Hulse,* called and sworn for the prosecution, testified: I have seen the prisoner, and know him by sight; I remember Saturday, the 19th of December; I saw him on the evening of that day on State street, just below the City Bank; he was going north; it was about half-past seven; no one was with him; I saw him distinctly.

The prosecution rested.

The defence, with a view to show that the homicide was not murder, but manslaughter, in addition to the facts already proved, introduced evidence tending to show the following facts:

The People *v.* Stout.

That a portion of the fractures on the skull might have been produced by a fall of the body of Littles over the precipice, and that a less number of blows were given upon Littles' head than would have been according to the opinion of the physicians who testified on the part of the prosecution; that soon after the marriage of Mr. and Mrs. Littles, difficulties arose between them on account of Littles' bad conduct towards her; that during the last summer Mr. Littles was sick with a venereal disease two or three weeks, and Mrs. Littles tended and nursed him during that time.

That Mr. Littles was very jealous of Mrs. Littles, and very angry when she had anything to do with any other man; that she, for some time past, extending through the past fall and up to the time of the homicide, had an intimacy with a certain man; that they used to meet clandestinely and walk together, and sometimes ride together; that Littles knew of it, and was very jealous of this man, and used to follow him and Mrs. Littles, and threatened him, and in one instance made preparations and threatened to shoot him; that Littles was very irritable and passionate when intoxicated, and was in the habit of drinking. Also, that the prisoner was a student in a commercial college in Rochester, and that he was on terms of friendship with Littles, and took his part in the family, and that he had repeatedly told Mrs. Littles that she ought to forgive her husband, and live with him again.

Also, that in the latter part of last fall Littles had purchased a house and lot in Rochester, and he and Mrs. Littles had an arrangement to go to keeping house in the next spring, if he behaved himself during the winter.

The evidence being closed, the court proceeded to charge the jury upon the law and facts of the case, and submitted the question to them, whether the prisoner was guilty of murder or manslaughter in the second degree.

The counsel for the prisoner requested the court to charge, among other things, as follows:

1st. In order to constitute a sufficient provocation for a homicide, to reduce it from murder to manslaughter, it is not

necessary that there should be a mutual combat, with blows given and received on both sides.

2d. It is not necessary that a blow should be given by the deceased; it is sufficient that any trespass upon the person should be committed by him which would arouse sudden passion.

3d. When the facts and circumstances accompanying a homicide are given in evidence by the prosecution and defence, .the question whether the crime be murder or manslaughter, is to be decided upon a review of all the evidence, as well that offered by the prosecution as that offered by the defence, and not upon any mere presumption arising from the mere fact of killing.

4th. That if there be any such presumption, it is a presumption of fact, and if the evidence lead to a reasonable doubt whether the presumption be well founded or not, that doubt will avail in favor of the prisoner.

5th. The burden of proof to maintain murder is always on the prosecution, and that burden of proof is not shifted by mere proof of the fact of killing. The prosecution must also prove, beyond a reasonable doubt, that the killing was with a premeditated design to produce death.

6th. If the jury have a reasonable doubt whether the homicide was manslaughter or murder, they are bound to give the prisoner the benefit of that doubt, and pronounce it manslaughter.

The court thereupon charged the jury as requested by the prisoner's counsel in the first, second, third, fourth and sixth of the foregoing propositions; and in regard to the fifth of said propositions, the court declined to charge as requested in that proposition, in respect to which the court instructed the jury that the burden of proof to maintain murder is always on the prosecution; that the rule of law is, when the fact of killing is proved to have been committed by the accused, and nothing further is shown or appears in the case to show that the killing was not intentional, the presumption is that such killing was premeditated, and the burden of proof

The People *v.* Stout.

to show that the killing was not intentional is then upon the prisoner. But where there is any evidence tending to show excuse or extenuation, it is for the jury to draw the proper inferences of fact from the whole evidence, whether adduced by the prosecution or evidence given by the prisoner. That it is in all cases incumbent upon the prosecution to prove, beyond a reasonable doubt, that the killing was with a premeditated design to produce death.

The counsel for the prisoner thereupon excepted to the decision of the court in declining to charge the jury as requested in the said fifth proposition, and also excepted to so much of the charge, in response to said request, as was at variance therewith.

The jury found the prisoner guilty of murder, and he was sentenced to be executed.

A writ of error was then allowed, and proceedings on the judgment stayed, to enable the prisoner to obtain a review in this court of the decisions in the court below.

*John N. Pomeroy,* for the plaintiff in error. (*a*)

I. The court erred in overruling the challenge for principal cause interposed by the prisoner to the juror, Johnson M. Tower.

(I.) A mere hypothetical opinion of a prisoner's guilt is not sufficient ground to sustain a principal challenge. (*Darrell* v. *Mosher,* 8 *Johns. R.,* 445; *People* v. *Honeyman,* 3 *Denio R.,* 121.)

1. An opinion of a juror based upon a hypothesis, does not involve the decision in his own mind of the question whether the reports or accounts of the prisoner's participation in the crime are true or false.

(*a.*) No apology can be necessary for reporting, more at length than usual, the points and briefs in this case. They cannot fail to be valuable to the profession, as containing a full reference to the authorities, and an able and philosophical discussion of the questions involved.

2. Such an opinion leaves the juror's mind open upon the very question to be passed upon in trying the issue for which the jury are empanneled.

3. The law is therefore strictly logical and philosophical, in refusing to reject jurors who have formed mere hypothetical opinions of the prisoner's guilt.

(II.) The opinion of the juror Tower was not *hypothetical,* but was *fixed* and *absolute* in its character, and disqualified him from sitting on the trial as a juror.

1. A *fixed* or *absolute* opinion of a juror is one which involves a belief in the *facts upon which* it is formed. (1 *Burr's Trial,* 367, 371, ed. of 1808; *Neeley* v. *The People,* 13 *Illinois R.,* 685; *McGowan* v. *The State,* 9 *Yerger R.,* 184; *Moses* v. *The State,* 10 *Humph. R.,* 456; *Nelms* v. *The State,* 13 *Smed. & Marsh.,* 500; *Sam.* v. *The State, Id.,* 189; *Smith* v. *Eames,* 3 *Scammon R.,* 76; *Gardner* v. *The People, Id.,* 83.)

2. The terms *fixed* and *absolute,* are used entirely as correlative to the term *hypothetical.* They do not refer to the amount or strength of the opinion, but to its character and foundation. (*See cases cited under the next subdivision.*)

3. An opinion which involves a belief in the truth of the facts upon which it is founded, although weak, and capable of being removed, renders a juror entirely incompetent. The law will not cast upon the prisoner the burden of overcoming the effect of any such pre-occupation of the juror's mind against him. (1 *Burr's Trial,* 367, 371, *ed. of* 1808; *Id.,* 414 *to* 419; *People* v. *Mather,* 1 *Wend. R.,* 223, 241-5; *Ex parte Vermilyea,* 6 *Cowen R.,* 555; *People* v. *Vermilyea,* 7 *Id.,* 108; *Bodine's case,* 1 *Denio R.,* 281, 304, 5; *Honeyman's case,* 3 *Id.,* 121; *Freeman's case,* 4 *Id.,* 9, 34; *Cancemi's case,* 16 *N. Y. R.,* 2 *Smith,* 501.)

Many of the States have followed the rule adopted in this State, and their reports furnish examples of its application. (*Potter's case,* 18 *Conn. R.,* 166; *Benton's case,* 2 *Dev. & Bat. R.,* 196, 212, 217; *Cotton* v. *The State,* 31 *Miss. R. ; Sam.* v. *The State, Id.,* 480; *Sam.* v. *The State,* 13 *Smed. & Marsh., Miss. R.,* 189; *Nelms.* v. *The State, Id.,* 500; *McGowan* v. *The State,* 9

The People *v.* Stout

*Yerger R.*, 184; *Moses* v. *The State*, 10 *Humph. R.*, 456; *Arn-stead* v. *Commonwealth*, 11 *Leigh. Va. R.*, 657; *Neeley* v. *The People*, 13 *Illinois R.*, 685; *Baxter* v. *The People*, 3 *Gilman R.*, 368; *Smith* v. *Eames*, 3 *Scammon R.*, 76; *Gardner* v. *The People, Id.*, 83.)

4. When a juror says that he has read or heard accounts of the transaction, and if they were true he had an opinion, and that he believed them true, such opinion is not hypothetical, but is fixed or absolute. (*Case of the juror Buckey*, 1 *Burr's Trial*, 367, 371; *Neeley* v. *The People*, 13 *Illinois R.*, 685; *McGowan* v. *The State*, 9 *Yerger R.*, 184; *Moses* v. *The State*, 10 *Humph. R.*, 456; *Nelms* v. *The State*, 13 *Smed. & Marsh.*, 500; *Sam.* v. *The State, Id.*, 189.)

5. If the statements of the juror are fairly susceptible of two constructions, one of which renders him competent, and the other incompetent, an appellate court will *in favorem vitae*, put upon them that interpretation which disqualifies the juror.

This proposition is the *important* point decided by the Court of Appeals in Cancemi's case, although the learned reporter has not referred to it in his head note. (2 *Smith*, 504.)

The decision of the court below on a controverted question of fact arising upon the juror's testimony, does not conclude the appellate court.

The judge at Circuit Court, in Cancemi's case, had passed upon such a question of fact, and had decided the juror competent, the Court of Appeals distinctly conceding that two interpretations might fairly be put upon the evidence, one admitting and the other excluding the juror, as distinctly adopt the latter.

6. An analysis of the testimony of the juror Tower, shows that his opinion was fixed or absolute, and not hypothetical.

On his direct examination he discloses an opinion formed after reading accounts of the transaction, expressed by him and retained.

He " says he thinks " he has an opinion, but this language is only that of extreme caution, leading the witness openly to express what all witnesses, in testifying to such a fact, must

necessarily imply. A person who speaks of the operations and state of his own mind, must necessarily think them to be as he expresses.

But the juror afterwards becomes absolute in his mode of expression and says plainly, "I formed an opinion," if, &c.

On his cross-examination he says he "formed an opinion if the accounts were true." This alone would show a hypothetical opinion merely. But he goes on and declares that he thought the accounts upon which this opinion was based were true, and that so far as he read he gave them credence.

What more could be said to indicate a disqualifying opinion? It is the case of a juror who has read accounts of the homicide, and believed them to be true, and upon such a basis forms an opinion of the prisoner's guilt, and is directly within the spirit and letter of the authorities cited.

But the juror goes further, and after disclosing an opinion founded upon such a basis, of the conviction of the truth of the alleged facts, says: "It might or it might not require evidence to remove my impression of the prisoner's guilt."

He does not say absolutely that it would not require evidence to remove his opinion, nor on the contrary that it would require such evidence.

But under the decision in Cancemi's case, there must be as much force at least given to the former as to the latter clause of this statement.

The juror then had such an opinion, based upon a belief in the truth of the statement upon which it was founded, as might require evidence to remove.

A man with a mind so pre-occupied, no matter how honest, the law pronounces unfit to try an issue of life or death.

Finally, in answer to a question from the court, the juror says: "I did not arrive at a definite opinion."

What does this mean? Did he intend to affirm that his opinion was not fixed or absolute, but hypothetical? He only gave a legal conclusion, which all the facts he had before testified to belie.

The People *v.* Stout.

The obvious meaning of this remark is, that he had no complete opinion upon the whole case; that he had not settled in his mind, *in a definite manner*, the entire details of the homicide; that he had not thus *defined* or marked out each particular; that his opinion was general, formed upon the general features or outlines of the case, rather than upon the minuter circumstances.

The peculiar phraseology shows that this was the idea in the juror's mind. *I have not arrived at* a definite opinion, implying that his mind had been and was in a condition of progress through the details of the case, and that as yet he had not settled them entirely, *definitely*.

It is submitted that the above is a fair analysis of the juror Tower's testimony, but that if it admit of any different construction, the court must adopt the one favorable to the prisoner.

(III.) The error was not obviated by the finding of the triers on the challenge to the favor. (*Cancemi's case, supra.*)

II. The court erred in admitting the evidence of Jane Stout and Margaret Stout, tending to establish an incestuous connection between the prisoner and his sister, Mrs. Littles.

(I.) It is a settled and fundamental principle of the common law, that on the trial of an indictment for one felony, evidence of other felonies committed by the prisoner cannot be given against him. (2 *Russ. on Crimes*, 694, *ed. of* 1841; *Wharton's Am. Cr. Law*, 238; *Roscoe's Cr. Ev.*, 80.)

1. In its administration of criminal jurisprudence, the civil law allows and requires such evidence. It investigates the antecedent character, disposition, habits, associates, business, in short the entire history of an accused person, to discover whether it is probable that he would commit the alleged crime. (*Feuerbach Remarkable Trials, preface.*)

2. English and American criminal law, in its practical administration, confines itself to the investigation of the very crime charged, and restricts judicial evidence to circumstances directly connected with and necessary to elucidate the issue to be tried.

3. These two systems are diametrically opposed to each other, and whatever may be said of their comparative merits, the rule of the common law is so firmly established that it lies at the very foundation of criminal procedure, as an inseparable element of the trial by jury.

4. Trained judicial minds may be able to eliminate from a mass of irrelevant and general criminative facts, those which directly bear upon the crime charged against the prisoner, but the very character of juries, and the theory of trial by jury, require that all prejudicial evidence tending to raise in their minds an antipathy to the prisoner, and which does not directly tend to prove the simple issue, should be carefully excluded from them.

(II.) While the general rule is thus embodied in the common law, as a part of its very foundation, there are certain exceptions, which have been introduced from *absolute necessity*, to aid in the detection and punishment of crime.

These exceptions are few in number, and have thus far been carefully guarded and limited by the courts.

They have all been allowed *as exceptions* from the *very necessity of the case*, while the general rule has, at the same time, been retained and enforced. (*See cases cited under the following subdivisions.*)

These exceptions are all embraced in the following classes:

1. Evidence of another felony than that charged may be admitted to prove identity.

(*a.*) Identity of the instrument used in committing a crime. (*Rex* v. *Fursey*, 6 *Car & Pa.*, 81; 25 *Eng. Com. L. R.*, 293.)

(*b.*) Identity of the persons engaged in committing a crime. (*Rex* v. *Westwood*, 4 *Car. & P.*, 547; 19 *Eng. Com. L. R.*, 520; *Rex* v. *Rooney*, 7 *ib.*, 517; 32 *ib.*, 608; *Osborne* v. *The People*, 2 *Park. Cr. R.*, 583.)

2. When a guilty knowledge or intent is necessary to be directly shown, other felonies done by the prisoner may be given in evidence. But these must be either acts of the same kind as the one charged, done by the prisoner upon others about the time of the alleged offence, or prior attempts to com-

The People *v.* Stout.

mit the same offence, or prior commissions of the same offence upon the injured party.

(1.) To prove guilty knowledge. This class of cases is almost entirely confined to the crime of uttering forged notes or coin. (*Rex* v. *Smith*, 2 *Car. & P.*, 633 ; 12 *Eng. Com. L. R.*, 295 ; *Rex* v. *Balls*, 7 *Id.*, 429 ; 32 *Id.*, 571 ; *People* v. *Hopson*, 1 *Denio R.*, 574 ; *People* v. *Tharp*, 15 *Ala. R.*, 749, 756 ; *Peck* v. *The State*, 2 *Humph. R.*, 78.)

(2.) To prove *guilty intent*, where the defence set up is that the act charged was done accidentally or innocently.

The intent referred to in this subdivision is not a *general* criminal intent, but the *particular intent*, as a matter of fact, with which the act was done.

This remark is necessary to limit the inaccurate general expressions of some text books, and judicial dicta. (*Rex* v. *Mogg*, 4 *Car. & P.*, 364 ; 19 *Eng. Com. L. R.*, 420 ; *Rex* v. *Winkworth*, *Id.*, 444 ; *Id.*, 465 ; *Rex* v. *Dossett*, 7 *Id.*, 318 ; 61 *Id.*, 304 ; *Rex* v. *Donall*, *Id.*; *Id.*, 306, *n.*; *Rex* v. *Farrell*, *Id.*; *Id.*, 308, *n.*; *Edgerton's case*, *Russ. & Ry. C. C.*, 375 ; *Voke's case*, *Id.*, 531 ; *Williams* v. *The State*, 8 *Humph. R.*, 585 ; *Walker* v. *The Commonwealth*, 1 *Leigh.* [*Va.*] *R.*, 574 ; *Wills on Circumstantial Evidence*, 33, 44 *marg. pag.*; *Burrill on Circumstantial Evidence*, 284.)

3. When the several felonies are so connected together *as to form parts of the same transaction*, so that a complete account of the one on trial cannot be given without introducing evidence of the others. (*Rex* v. *Ellis*, 6 *Barn. & Cress.*, 139 ; 13 *Eng. Com. L. R.*, 123 ; *Rex* v. *Birdseye*, 4 *C. & P.*, 386 ; 19 *Id.*, 433 ; *Rex* v. *Salisbury*, 5 *Id.*, 155 ; 24 *Id.*, 253 ; *Rex* v. *Long*, 6 *Id.*, 179 ; 25 *Id.*, 343 ; *Reese* v. *The State*, 7 *Georg. R.*, 373 ; *Walker* v. *The People*, 1 *Leigh* [*Va.*] *R.*, 574 ; *Voke's case*, *Russ. & Ry. C. C.*, 531 ; *Rex* v. *Wylie*, per *Lord Ellenborough*, 1 *New Rep.*, 4 *B. & P.*, 92 ; *People* v., *Wood*, *Livingston Oyer and Terminer*, 1858. *Johnson, J.*, opinion on motion for a writ of error.) (*a.*)

4. Evidence of a distinct felony committed by the prisoner at a different time, and on a different person, may be intro-

(*a.*) 3 Park. C. R., 681.

duced, *when proof has been given showing some connection between the transactions, and raising a presumption that the latter grew out of and was caused by the former.* (*Rex* v. *Clewes,* 4 *Car. & P.,* 221; 19 *Eng. Com. L. R.,* 354; *Johnson* v. *The State,* 17 *Ala. R.,* 618, 625; *Dunn* v. *The State,* 2 *Ark.* [*Pike*] *R.,* 229; *Walker* v. *The State,* 1 *Leigh* [*Va.*] *R.,* 514; *Stone* v. *The State,* 4 *Humph. R.,* 27; *Kinchelow* v. *The State,* 5 *Id.,* 9; *Per Johnson, J., in Wood's case, supra.*)

The last two subdivisions in fact fall under the same general exception, for no case can be found in which the different felonies did not form acts of the same drama in carrying out the original criminal intent of the accused party.

The rule stated in the last exception is a nearer approach to the civil law doctrine than any of the other classes, and is in spirit quite opposed to the theory of the common law, and it should not at least be extended beyond the decided cases unless required by imperative necessity.

(III.) This case does not in any of its circumstances fall within the exceptions to the general rule.

1. It is plainly not included within either of the first three classes of exceptions. There is no question of identity, nor does the evidence tend to show a guilty knowledge or intent, nor were the incest and homicide parts of the same transaction. (*See cases under the* 1*st,* 2*d and* 3*d classes of exceptions.*)

2. Nor is the evidence embraced within the fourth class. No adjudged case in the least resembles the one at bar in the facts, nor is the reason of the rule applicable to it, so as to require the evidence in order to secure the detection of crime.

It will be claimed now, as it was on the trial, that the evidence of incest was admissible upon the question of motive.

(1.) In all capital cases, and especially in those where the evidence is entirely circumstantial, it is eminently proper, *though not indispensable,* for the prosecution to show some motive for the commission of crime. (*Best on Presumption,* 309; *Wills on Circumstantial Evidence,* 28 *to* 34, *Am. ed.,* 37 *to* 45, *marg. pag;* 1 *Starkie on Evidence,* 491; *Burrill on Circumstantial Evidence,* 281 *to* 328.)

The People *v.* Stout.

It is so contrary to *ordinary* human experience for murder to be committed, that it is difficult to conceive of its perpetration, unless the criminal were impelled thereto by some strong mental influences which to him seemed controlling.

(2.) Evidence to show a motive is applicable to the issue, whether the accused be guilty of the alleged crime of murder, and not to any independent or subordinate issue. (*Burrill on Circumstantial Evidence*, 296, 7.)

*a.* There is no separate and minor issue of whether the accused had a motive to commit the crime.

*b.* The single issue for the prosecution to maintain, in trials for murder, is, *did the prisoner intentionally kill the deceased?*

*c.* Upon this simple and single issue, and applicable to the fact of premeditation, proof of motive is competent and important, *and goes directly to the question of the guilt of the prisoner.*

*d.* All legitimate evidence of motive, therefore, must have a tendency to show the accused guilty of premeditation in the homicide.

(3.) The evidence to substantiate a motive to commit the crime alleged, must be such as to show, not a general antecedent probability of the prisoner's committing crime generally, *or that crime in particular*, but such as to show a *direct tendency and impulse in his mind to commit that very crime, on the very person.*

*a.* It is true that the range of inquiry in showing motive, must, from the nature of the subject, be very broad. (*Hendrickson* v. *The People*, 6 *Seld. R.; Wills on Cir. Ev., supra; Burrill on Cir. Ev., supra.*)

*b.* But not broader than the nature of the subject demands. The field cannot be open to the *guesses* of the jury.

*c.* There must be an *apparent and necessary connection* between the evidence offered, and the motive which it claims to substantiate. (*Per Johnson, J., in Wood's case, supra.*)

*b.* And that motive must be *particular and direct in its application*, to the crime for which the prisoner is charged.

(4.) When the evidence offered to show motive consists of proof of another and distinct felony, it can only be received

under the limitations and in the instance stated in the fourth class of exceptions before given. (*See cases cited under the fourth class. Supra.*)

(5.) The evidence in question tended to prove a felonious incestuous connection between the prisoner and his sister, and did not tend to show any motive in his mind for the murder of the deceased.

A. Assuming the theory upon which the trial was conducted, as given in the preceding statement of facts, and upon the motive therein imputed to the prisoner, the evidence of incest was incompetent.

*a.* There was no evidence in the case showing, or tending to show, any connection between the incest and the murder. (*Dunn* v. *The People. Supra.*)

*b.* Nor to raise a presumption that the murder grew out of, or was in any way referable to the incest. (*Dunn* v. *The People, supra; Rex* v. *Clewes, supra; Walker* v. *The Commonwealth, supra.*)

*c.* Nor do the necessary laws of human conduct and experience point to the murder as in the least resulting from the former felony.

*d.* The evidence shows a wicked intimacy between the prisoner and his sister, and raises a general presumption from his depraved moral character, that being guilty of incest, he would not falter at murder; but such presumptions are entirely rejected by our criminal law. (1 *Leigh* [*Va.*] *R., Walker's case.*)

*e.* This felony shows an intimacy of the *same kind* between the prisoner and his sister, as would have been shown by proof that they had together committed a murder, an arson, a robbery, or any other heinous crimes, and beyond all question, evidence that they had been jointly engaged in such other felonies, would not be received to show the motive.

B. On the argument of this writ of error, the People may adopt another hypothesis, and impute a different motive to the prisoner. It may be urged that these guilty parties, being detected in their incest by the husband, took his life solely for the purpose of preventing him from exposing or punishing the

The People *v.* Stout.

crime, or for the purpose of allowing them the more free indulgence in their wicked propensities.

If this view of the case is now urged, I say:

*a.* The trial did not proceed upon any such hypothesis, as is palpable from the bill of exceptions, which contains the substance of all the testimony. (See especially the testimony of Jane Stout and Margaret Stout, in full.)

*b.* Upon this theory there were no facts or circumstances proved connecting the incest with the murder, and raising the presumption that the latter was caused by the former. (*See cases cited under the 4th class of exceptions.*)

*c.* The cases of *Rex* v. *Clewes*, *People* v. *Dunn*, and *People* v. *Wood*, are the only ones which can be found, in which evidence of a prior distinct felony upon another person has been admitted upon such a theory to show motive, and in each of these cases *there was direct and distinct evidence given for the express purpose of connecting the two felonies.*

*d.* The prosecution showed affirmatively that the deceased did not complain or interfere with, and was not angry at these acts of the parties.

*e.* This hypothesis is an after-thought, and the People are not warranted in adopting it to sustain the evidence which was admitted upon an entirely different theory.

(IV.) This evidence was eminently calculated to blacken the moral character of the prisoner, to show him depraved and lost to all sense of decency, and to weigh most powerfully against him with the minds of a jury, not trained by legal studies to abstract from their consideration all facts not directly relevant to the issue. (*Thurston* v. *The People*, 2 *Parker's Cr. R.*, 49, 130.)

III. This court cannot consider or weigh the question whether the prisoner be guilty of the crime charged. If errors have been committed, the judgment must be reversed, and a new trial awarded.

The result of this case, in its bearing upon the prisoner, is insignificant compared with its importance in correctly determining the law.

"However clear the proof of the prisoner's guilt in this case may be, it is better that the people should be put to the trouble of establishing it upon a second trial, than that the force of a salutary rule, upon which life may often depend, should be impaired." (*Per Selden, J.*, 15 *N. Y. Rep.*, 397.)

*C. Huson Jr.* (District Attorney), for the People.

I. The challenge to the juror, Tower, was properly overruled. As a question of law, and as a matter of fact, he had formed no such opinion as disqualifies. (*The People* v. *Freeman*, 4 *Denio*, 9; *The People* v. *Honeyman*, 3 *Denio*, 121; *The People* v. *Bodine*, 1 *Denio*, 281; *Blake* v. *Mellspaugh*, 1 *Johns.*, 316; *Durell* v. *Mosher*, 8 *Johns.*, 347; *Pringle* v. *Huse*, 1 *Cowen*, 432, note; *The People* v. *Vermilyea*, 6 *Cowen*, 555; *Id.*, 7 *Cowen*. 108; *The People* v. *Mather*, 4 *Wend.*, 229; *The People* v. *Cancemi*, 16 *N. Y.*, 501; *Am. Crim. Law*, 945, *et seq.*; 1 *Burr's Trial*, 413–420; *The State* v. *Potter*, 18 *Conn.*, 166; *Com.* v. *Sprouce*, 2 *Virg. Cas.*, 375; *The State* v. *Benton*, 2 *Dev. and Bat.*, 196; *The State* v. *Ellington*, 7 *Iredell*, 61; *Bacon's Abr*, *Juries, E.*; *Com.* v. *Ostrander*, 5 *Leigh*, 780; *Com.* v. *Moran*, 9 *Leigh*, 651; *Com.* v. *Epes*, 5 *Grattan*, 676; *Com.* v. *Smith*, 6 *Grattan*, 696; *Id.*, 7 *Grattan*, 593; *Com.* v. *Clore*, 8 *Grattan*, 606; *Com.* v. *Wormsley*, 10 *Grattan*, 658.

From the above cases we conclude:

1. It is a ground of challenge for principal cause, that a juror has formed and expressed an opinion touching the guilt of the prisoner. (*And see American Cases, passim.*)

2. But such opinion must be "definite," "determinate," "fixed," "settled," "unconditional," "absolute." —— And not merely "hypothetical," "conditional," "contingent," "indeterminate," "floating," &c. (4 *Denio*, 9, 34; 3 *Id.*, 121, 123; 4 *Wend.*, 229, 243; 8 *Johns.*, 347; 7 *Iredell*, 61, 62; 18 *Conn.*, 166.)

3. A challenge for cause must be disposed of, either on demurrer or by traverse. In the former case it is purely a question of law; in the latter it is almost always a question of *fact*.

4. Formerly, as it is sometimes the case now, triers found the questions of fact the same as on challenge for favor. Now, they are generally found by the court. But whether found by the court or by triers, so far as they are *questions of fact,* they cannot be reviewed by an appellate court. For the last three propositions, *see* 4 *Denio,* 31–34; 6 *Cowen,* 555; 4 *Wend.,* 227, *et seq.;* 2 *Dev. and Bat.,* 215–218; 7 *Iredell,* 61–63.

5. Most of the confusion and the conflicting *dicta* on the subject of challenges, in our reports, have arisen from a failure on the part of some judges to distinguish between questions of *law* and matters of *fact.* Appeal judges have assumed to overrule Oyer and Terminer judges sitting as triers.

6. It is incumbent on the challenging party to prove the *truth* of his challenge. (2 *Virg. Cas.,* 375.)

7. In the case at bar, the juror swore he had no definite opinion; the judges sitting as triers found that he had no opinion whatever importing bias—and who shall say he had?

8. Compare the testimony of the juror in this case with that of the juror (see for testimony trial of *Freeman,* 165, in the case 4 *Denio,* 9–15, 34, 35; *and in* 7 *Iredell,* 61, 62; *as also in the other cases above quoted.*)

II. Evidence that the defendant and Mrs. Littles slept together was properly received. It tended powerfully to prove motive; and that it tended to prove another felony, makes no difference. (*Roscoe's Cr. Ev.,* 81, *et seq.; Bur. Cir. Ev.,* 290, 291; 2 *Cow. and H. Notes,* 462, *et seq.; Am. Cr. L.,* 3d ed., 292, *et seq.; Russ. on Cr.,* 694; 1 *Starkie's Ev.,* 491; 1 *Greenl.,* § 53; *Cary et al.* v. *Hotailing et al.,* 1 *Hill,* 311; *Olmstead et al.* v. *same, Id.,* 317; *The same* v. *Watkins,* 9 *Conn.,* 47; *Rex* v. *Clewes,* 4 *Car. & P.,* 221–444; 19 *Eng. Com. L.,* 354; *Com.* v. *Heath,* 1 *Robinson,* 735; *The State* v. *Rash,* 12 *Iredell,* 382; *The State* v. *Stone,* 4 *Humph.,* 27; *The State* v. *Williams,* 8 *Id.,* 585; *The State* v. *Baker,* 4 *Ark.,* 56; *The State* v. *Baalam,* 17 *Alabama,* 451; *The State* v. *Martin et al.,* 28 *Id.,* 71; *The State* v. *Bob,* 29 *Id.,* 20; *The People* v. *Wood, per Johnson, J.; The People* v. *Rathbun,* 21 *Wend.,* 509; *The People* v. *Hopson,* 1 *Denio,* 574.)

1. It is a general rule that evidence must be confined to the issue.

2. Motive is a *fact* which may be proved like any other fact in the case.

3. Whatever fact fairly tends to prove the assumed motive, is competent, though that fact be the subject of a distinct felony. (1 *Park. Cr. R.*, 649–655; *Id.*, 495–539; *Am. Cr. L.*, 292, *et seq.; Roscoe Cr. Ev.*, 81, *et seq.;* 19 *Eng. Com. L.*, 354; *and see other cases cited above;* 1 *Leading Cr. Cas.*, 189, *and cases cited in note.*)

4. Whenever guilty knowledge is required to be shown, every fact tending to show it is admissible, although it proves a distinct and separate felony. (*See all the cases.*)

5. The same is true when intention is an ingredient of the crime charged.

6. It is no objection to a fact, otherwise competent, that it tends to prove, or does prove, a distinct felony.

MURDER.—Proof of a previous murder competent to show motive for the one charged. (4 *Car. & P.*, 221; 19 *Eng. Com. Law*, 354; 1 *Robinson*, 735; 2 *Ark.*, 229; 243 *et seq.*)

INCEST.—Former attempts admissible to show the *quo animo* of the attempt charged. (8 *Humph.*, 585–593.)

MALICIOUS SHOOTING.—Same as above. (*Russ. & Ry.*, 531.)

ADULTERY.—On trial for murdering his wife, it was proved that defendant committed adultery with Mrs. B. (In Connecticut this was a crime.) (9 *Conn.*, 47–51; 1 *Leading Cr. Cas.*, 201, *note.*)

FRAUD.—Previous acts of fraud competent on trial for the fraud charged. (1 *Hill*, 311, 316.)

CRIMINAL ILL-TREATMENT.—On trial for murder, former criminal conduct competent. (12 *Iredell*, 382; 4 *Humph.*, 27, 36.)

ARSON.—Previous attempt to induce another person to burn the house, admissible. So also may prove a larceny. (28 *Alabama*, 71; *Rickman's Case*, 2 *East. P. C.*, c. 21.)

ASSAULT WITH INTENT TO KILL.—A blow aimed at one person kills another. Evidence of former attempts on the first person admitted. (29 *Alabama*, 20.)

The People *v.* Stout.

LARCENY.—One larceny may be proved on trial for another. (13 *Eng. Com. Law,* 145.)

FORGERY.—One forgery may be proved on trial for another to show *scienter.* (*Am. Cr. Law,* 292–300, *and all the cases.*)

BURGLARY.—On trial for burglary, larceny may be proved; or forgery, as where the burglary was committed to procure forged paper, or to destroy evidence of it, or generally any felony which may have furnished a motive to the crime charged. (*Burr. Cir. Ev.,* 290, *et seq.*)

7. In this case the defendant, Stout, was brother of his co-defendant, Mrs. Littles, and brother-in-law of Mr. Littles, the deceased. Evidence of an adulterous connection was competent to rebut the *natural* presumption growing out of the relation of defendant and deceased. (9 *Conn.,* 47; 17 *Alabama,* 451.)

8. It is in proof that Mr. Littles knew that defendant slept with his wife; that he took Sarah out of the bed, &c. If this conduct was incestuous, had not defendant a powerful motive to get rid of the evidence of it? (4 *Car. & P.,* 221.)

9. Evidence is competent, under the head of motive, which the court can see might possibly influence the conduct of the prisoner.

WELLES, J. The counsel for the plaintiff in error contends that the judgment should be reversed upon two grounds, which I shall proceed to state and consider.

I. On the trial, in the course of impanneling the petit jury, Johnson M. Tower was drawn and called as a juror, and appeared. He was challenged by the prisoner's counsel for principal cause, on the ground that he had formed and expressed an opinion touching the prisoner's guilt, and the district attorney traversed the challenge. The juror being sworn and examined as a witness on behalf of the prisoner in support of the challenge, testified as follows: I have read part of the accounts of the transaction in the newspapers; I think I have an impression as to the defendant's guilt or innocence; I rather think I have formed an opinion; I presume I have expressed it; I think I retain it. On his cross-examination he testified;

I formed an opinion if the accounts were true; I rather thought they were true; so far as I read I gave them credence. On his re-direct examination he testified: I rather think I believed the accounts true; it might or might not require evidence to remove my impression of the defendant's guilt. In answer to a question by the court, the juror testified: I did not arrive at a definite opinion. The court thereupon overruled the challenge, and the prisoner excepted. The juror was then challenged for favor, and after evidence given to the triers, they, on hearing arguments of counsel, and being charged by the court, found the juror indifferent, and he was sworn as a juror, and sat as such during the trial. The decision of the court below, in overruling the challenge to the juror Tower, for principal cause, as above stated, constitutes the first ground of error as now urged by the counsel for the plaintiff in error.

We should not lose sight of the fact that the question is upon the principal challenge for cause, to wit: that the juror had formed and expressed an opinion, &c. That was the cause or matter of fact alleged as the ground of objection to his competency. If the allegation that he had formed and expressed an opinion touching the prisoner's guilt, was true, then, as matter of law, the juror was incompetent. But the fact alleged was traversed, and its existence put in issue. It was therefore incumbent upon the prisoner to prove its truth. He held the affirmative in this issue, and was bound to sustain it by evidence. *Prima facie* the juror was competent, and must now be so regarded, unless by a fair construction of the evidence given in support of the challenge, we can see that the court below committed an error in overruling it. That court did not believe that the alleged fact was proved. Their con clusion of fact upon the evidence, was, that the juror had not formed or expressed an opinion. The question before this court is, whether their conclusion was correct or erroneous.

Challenges to the jury are of two sorts: First, to the array, and second to the polls. The latter is subdivided into, first, challenges for principal cause; second, challenges for favor; and third, in certain cases and to a limited extent, peremptory

The People *v.* Stout.

challenges—the last of which requires no cause to be alleged or proved to sustain it.. All others are to be regularly tried by the court, except the challenge for favor, which is to be determined by *triers.* In all of them, except peremptory challenges, the matter of fact upon which the challenge is founded must be specified when the challenge is interposed, or the court should disregard it. In every case of challenge for cause, whether to the array or to the polls, the other party, and in criminal cases, if the challenge be by the prisoner, the public prosecutor, may traverse the facts alleged as the ground of the challenge, or he may demur, by which he admits the truth of the allegation.

A challenge to the poll for principal cause, to be effectual, must be on account of some matter of fact, which, if admitted or proved, necessarily and conclusively disqualifies the juror. Among the causes for such challenge, is the one assigned against the juror in the present case—that he had formed and expressed an opinion in relation to the prisoner's guilt. When that is established, the law declares, and it is the duty of the court, to pronounce him incompetent. In such a case the law implies a bias in the mind of the juror which disqualifies him.

In this connection it is important to understand what is meant by an opinion, which operates thus conclusively to disqualify a person as a juror. We say it is an opinion which is absolute, unconditional, definite and settled; in distinction from one which is hypothetical, conditional, indefinite and uncertain. The mind must be, for the time being, settled and at rest upon the question of the prisoner's guilt, or upon the question to be tried. Nothing short of this will, *per se,* render the juror incompetent in law upon a challenge for principal cause, founded upon an allegation that he has formed an opinion. This is the good sense of the rule, and according to the current of authorities. (*Freeman* v. *The People,* 4 *Denio,* 1; *The People* v. *Bodine,* 3 *Id.,* 281; *The People* v. *Honeyman, Id.,* 121; *Durrell* v. *Mosher,* 8 *Johns. R.,* 347.)

Upon a challenge for favor to be determined by triers, the rule is different, although the objection rests upon the same

foundation in both cases—that of bias in the mind of the juror. In the one case the law implies such bias from the fact alleged and admitted or proved, and in the other, the triers. may be justified in finding its existence from the evidence presented to them, tending to show that the juror does not stand indifferent, although there be no direct evidence proving that he has formed or expressed such an opinion as necessarily constitutes a legal disqualification.

We will now examine whether, in the light of the foregoing rules, the challenge in question was sustained by the evidence given in support of it. Had the juror formed or expressed an opinion touching the guilt of the prisoner which was absolute, unconditional, definite and certain?

1st. The evidence does not prove that he had formed an opinion. On this question the juror testified that *he thought he had an impression;* he rather thought he had formed an opinion; he presumed he had expressed it, and thought he retained it; that he had formed an opinion, if the newspaper accounts of the transaction (of which he had read only a part), were true; that he rather thought they were true, and that, so far as he read, he gave them credence. This does not prove the existence of an opinion in the mind of the juror. An opinion, in this sense, implies a settled judgment or conviction of the mind. If that was the condition of the juror, he certainly knew it.

2d. Whatever else may have been the juror's mental state, it cannot be said that he had an absolute and unconditional opinion in relation to the guilt of the prisoner. If he had any opinion on the subject, it was founded upon the hypothesis that the newspaper accounts were true. Of those accounts he had read only a part, and he rather thought they were true. He does not say he believed them true, but his expression implies hesitation of mind and doubt on the subject.

3d. The opinion, if such it can be called, of the juror, was indefinite and uncertain. He expressly states, in the conclusion of his evidence, that he did not arrive at a definite opinion. He had previously testified that he *thought* he had an *impression* as to the defendant's guilt or innocence. It cannot be useful

to multiply words on a proposition so simple and plain. The substance of the evidence on this point is, that the juror *thought* he had an *impression*, which his own account of it shows was uncertain, indefinite and incomplete.

Upon the argument it was urged by the prisoner's counsel, that the evidence in support of the challenge in question brought the case substantially within the rule of exclusion adopted in the case of *Cancemi* v. *The People*, lately decided by the Court of Appeals. (16 *N. Y. R.*, 501.) In my judgment, however, the cases are plainly distinguishable. On the trial of *Cancemi*, Alexander Kyle was called as a petit juror, and being challenged for principal cause, testified that he had formed an opinion and expressed it. On cross-examination, he said that he had no fixed opinion—none which could not be removed by evidence. The challenge was overruled; and the defendant excepted. The prisoner was convicted of murder, and judgment of death pronounced upon him. The judgment was reversed in the Court of Appeals on this exception.

The fact, as disclosed by the evidence of the juror, was that he had formed an opinion, which was so fixed as to require evidence to remove it, and that he had expressed such opinion. The qualification of the opinion, in his cross-examination—that he had no fixed opinion—is itself qualified by what immediately follows, viz. : that he had no opinion which could not be removed by evidence. Taking it altogether, the plain and simple construction of his evidence is this : that he had formed and expressed an opinion touching the guilt of the prisoner; but that such opinion was not so firm as to be beyond the power of evidence to remove it. Or, that it was so fixed, that it would remain until displaced or overcome by evidence. The case, as thus presented, was obviously within the rule of exclusion of the juror. There was no doubt of the fact that the juror had formed and expressed an opinion. He had so testified, unequivocally. The opinion he had formed was absolute, unconditional, definite and certain. There was nothing to show it to have been hypothetical or conditional, uncertain, indefinite, or incomplete. In these respects, it forms

an entire contrast to the case at bar. This will be more apparent by placing the substance of the evidence given in support of the challenges in the two cases, respectively, in juxtaposition. In *Cancemi's* case, the evidence was that the juror had formed and expressed an opinion touching the guilt of the prisoner, which would remain until displaced by evidence. In the present case it was, that the juror had read part of the accounts of the transaction in the newspapers; that he thought he had an impression as to the defendant's guilt or innocence; that he rather thought he had formed an opinion, if the accounts were true; that he rather thought the accounts were true; that, so far as he had read, he gave them credence; that he presumed he had expressed an opinion, and thought he retained it; that it might or might not require evidence to remove his impression of the defendant's guilt; and finally, that he had not arrived at a definite opinion.

We think the exception to the decision of the court below, in overruling the challenge in question, was not well taken.

II. On the trial the following facts, in substance, were proved: The dead body of Charles W. Littles was found on the morning of the 20th of December, 1857, in the Genesee river, below the falls, in Rochester. From the appearance of the body and of the ground at the top of the bank and on the side of the slope, it was evident that the deceased came to his death by violence. He had been last seen the night before, between seven and eight o'clock. Much evidence was given, tending strongly to show that the prisoner and Sarah Littles, who was his sister and the wife of the deceased, were present at the homicide. They were at their mother's house the night before at tea. Mrs. Littles left the house about half-past six o'clock, and the prisoner about seven, in the evening, and were met near the house of their mother returning together, about ten o'clock, and were found by their mother together in a room in her house about eleven o'clock; each had a broken arm, bruises on their persons, and spots of blood on their garments. In the night a physician was sent for, who set the prisoner's arm. Attempts were made the same night to remove the blood spots, and

to conceal other evidences of crime. On the same night they sent their mother and a younger brother to the point below the falls, near where the body of Littles was found the next morning, to get the prisoner's cap and Mrs. Littles' breastpin, saying that they had been walking down on the Falls Field, and had fallen over the bank. The cap and pin were found and brought home. A pair of side-combs, a rosette for the hair, and the tag of a victorine, were found on the spot the next morning, which appeared to belong to Mrs. Littles.

The theory of the prosecution, as stated to the jury, and as drawn from the evidence, was, that difficulties had existed for a long time between Mrs. Littles and her husband; that she had partially separated from him, and that they had not lived together as husband and wife since the month of June, 1857; that the prisoner, having been absent from home for five or six years, returned in August, 1857, and that being informed of the difficulties between his sister and the deceased, entered into and espoused her cause; that Mrs. Littles had, that fall, intended to leave Rochester and go west, and had left her watch with one Mackie, a jeweler, for sale, in order to raise money; but that the prisoner and she at last adopted a plan by which the deceased was to be decoyed to the Falls Fields by Mrs. Littles, under the pretence of an assignation on her part with another man, and that while there, the prisoner, who was to go with Littles, would commit the homicide.

Evidence was given by the prosecution, showing a state of difficulty between Mrs. Littles and the deceased, that they had quarrelled and partially separated; that since the month of June, 1857, they had not lived together as husband and wife, but during the fall of that year, and especially in the months of November and December, the deceased spent a large part of his time at the house of his wife's mother, where she lived, and eat and slept there with his wife frequently; that the deceased was very jealous of his wife; that the prisoner having been absent from home five or six years, returned in August, 1857, and was informed of the difficulties between Mrs. Littles and the deceased; also, that Mrs. Littles, the past fall, had left

her watch at Mackie's shop to be sold, and that on the night of the homicide, and before it, she took the watch away from the shop. In June, 1857, Mrs. Littles applied to an attorney to procure a divorce from her husband, but the attorney advised against the application.

At this stage of the proof, evidence was offered by the prosecution having a tendency to show an incestuous connection between the prisoner and his sister, Mrs. Littles, during the fall of 1857. The evidence was objected to by the prisoner's counsel, and received by the court on the question of motive, and the prisoner's counsel excepted. No evidence was offered tending to connect this with the homicide, other than as might be inferred from the fact of the homicide occurring subsequent to the assumed incest; and no other evidence was offered on the subject, except that it appeared that the deceased saw at least one of the acts of sleeping together by the parties, and that he exhibited no anger on the occasion, and it did not appear that he made any objection thereto.

The decision of the Oyer and Terminer, in overruling the objection to this evidence, constitutes the remaining ground of error, as now urged in behalf of the prisoner.

It is a general rule of the common law, applicable to the trial of issues, both in civil and criminal cases, that the evidence shall be confined to the question in issue. This rule should be strictly observed in criminal cases. (2 *Russ. on Crimes*, 772; *Rosc. Cr. Ev.*, 81; 1 *Phill. Ev., Cow. & Hill's ed.*, 169, 178.) Hence, on a trial for felony, the prosecution will not generally be permitted to give evidence tending to prove the defendant guilty of another distinct and independent felony. The only effect of such evidence, unless it went to establish some fact essential to make out the crime charged, such as a motive, *scienter* or identity, and so connected with it as to be a part of the *res gesta*, would be to prejudice the defendant with the jury, without thereby advancing a particle in the proof of the felony for which the defendant stands indicted. But where  the evidence tends to establish any essential ingredient of the crime charged, the fact that it proves or tends to prove another

The People *v.* Stout.

felony not charged in the indictment, is not a reason why it should be excluded. It is no objection to evidence of a fact, otherwise competent, that it proves or tends to prove a distinct felony. The evidence in this case, tending to show that the prisoner had been guilty of the crime of incest with his sister, Mrs. Littles, was, in my judgment, entirely competent. It went strongly to establish a motive on the part of both of them to get the deceased out of the way. While he lived, they were at his mercy. He was more interested than any one else to prosecute them for the crime. He was and had been for months on bad terms with his wife, and the inference from the evidence is strong that the prisoner sympathized with her, entered into her feelings, and espoused her quarrel with her husband. In case he was effectually disposed of and silenced, their fears of exposure and detection would naturally be lessened, and their sense of safety and impunity increased.

The *corpus delicti* had been proved, and the principal question for the jury to determine, was, whether the prisoner was the perpetrator of, or implicated in, the crime. The evidence on that question, though circumstantial, was strong and convincing that he was the murderer. If anything was wanting, it was a motive on his part. That motive was supplied, in connection with other facts proved, by the evidence, the admission of which was the foundation of the exception under consideration. The only objection urged against its admission, is, that its tendency was to prove the prisoner guilty of another and distinct felony. That the objection is not well founded, is to my mind clear, not only from the reason and good sense of the case, but upon authority. The cases of *Rex* v. *Clewes* (4 *Car. & Paine*, 221; found also in 19 *Eng. Com. L. R.*, 354), and *The State* v. *Watkins* (9 *Conn. R.*, 47), as well as others which might be referred to, establish clearly, as I think, that the evidence in question was properly admitted.

I am accordingly of opinion that the judgment of the court below should be affirmed.

E. DARWIN SMITH, J.  Two questions are presented upon the writ of error in this case, for our examination and decision. The first relates to the decision of the Oyer and Terminer overruling the challenge of the prisoner to the juror Johnson M. Tower, and the second to the admissibility of the evidence allowed on the trial, showing an incestuous intimacy between the defendant and Mrs. Littles, the wife of the deceased.

First.  The question in respect to the competency of the said Johnson M. Tower to serve as a juror, arises upon an exception to the decision of the court, overruling the challenge of the defendant for principal cause.   It appears, from the bill of exceptions, that during the proceeding to impannel a jury for the trial of the prisoner, the said Johnson M. Tower was " drawn and called as a juror, and was thereupon challenged by the prisoner for principal cause, on the ground that he had formed and expressed an opinion touching the guilt of the prisoner, and the district attorney traversed the challenge." .

By traversing the challenge, the district attorney admitted its validity as matter of law, but denied its truth. (*The People* v. *Freeman*, 4 *Denio*, 33.)   An issue of fact was thereby formed for trial, and which the prisoner was bound to sustain by evidence.

If the district attorney had demurred to the challenge, he would have admitted that this juror had in fact formed and expressed an opinion touching the guilt of the prisoner.   The force of the demurrer would have been that such fact did not constitute any objection to, or disqualification of, the proposed juror.

This would have presented a distinct *issue of law* properly addressed to and necessarily triable by the court.   If the court had sustained such demurrer, the decision would have clearly been one of *law*, and to which an exception would have laid.

But an issue of *fact* having been joined upon the challenge, it seems that it was referred to the court for trial.   This is the general practice at the present day, but it rests upon no authority on the part of the court to decide a disputed question of fact.

The People *v.* Stout.

It is generally a matter of consent, express or implied, at the trial, and most convenient for the dispatch of business, that the court should try and dispose of this issue. Without such consent the challenge for principal cause, like the challenge to the favor, when there is dispute about the facts, should strictly be referred to triers. (*The People* v. *Derrick*, 6 *Cow.*, 559; 2 *Park. Crim. R.*, 230; *State* v. *Ellington*, 7 *Iredell*, 63; *State* v. *Benton*, 2 *Dev. and Battle*, 207.) No objection seems to have been made to the trial of this issue by the court, and no exception is taken on that account, or to that mode of proceeding in disposing of this issue. It was so tried, doubtless, by the tacit consent of the counsel, and in accordance with the customary practice at the Circuit and Oyer and Terminer.

Assuming, then, that the issue of fact presented upon this challenge was properly referred to the court for trial, the burden of proof was upon the prisoner to establish by evidence the truth of the facts alleged as the basis of the challenge. (2 *Virginia Cases*, 378.) The ground of the challenge is, that the said Johnson M. Tower "had formed and expressed an opinion touching the guilt of the prisoner."

The question then arises, what kind of a *formed* and *expressed* opinion it was necessary to prove to sustain the challenge. This, it is well settled in numerous cases, must be a *fixed, absolute, positive, definite, settled, decided, unconditional* opinion. The rule is uniformly laid down by the use of one of these words, or *words of equivalent force.* (4 *Denio*, 9–34; 3 *Id.*, 133–9; 4 *Wend.*, 229, 243; 8 *John.*, 347; 1 *Denio*, 281; 4 *Wend.*, 243; 2 *Virginia Cases*, 378.) A *conditional, contingent, hypothetical, indeterminate, floating, indefinite, uncertain* opinion will not do, nor *an impression*, idem. (*Mann and Glover* v. *Glover*, 2 *Green*, 195; *Ex parte Vermilyea*, 6 *Cow.*, 565; *Durell* v. *Mosher*, 8 *John.*, 445.)

Tested by this rule in regard to what the opinion must be to sustain the challenge, let us see if the prisoner proved the juror to have formed and expressed *such an opinion.*

The juror was himself called as the witness in support of the challenge. He testified " that he had read part of the accounts

of the transaction in the newspapers," and said, "I think I have an impression as to the defendant's guilt or innocence; I rather think I have formed an opinion; I presume I have expressed it; I think I retain it." On cross-examination, he said, "I formed an opinion if the accounts were true.; I rather thought they were true; so far as I read I gave them credence." On further direct examination, he said: "I rather think I believed the accounts were true; it might or might not require evidence to remove my impression of the defendant's guilt." To a question put by one of the court, he answered: "I did not arrive at a definite opinion."

Upon this evidence the court decided that the challenge was not sustained, and overruled the same; or, in other words, the court decided that the prisoner had failed to prove the issue on his part, that the juror had formed and expressed any such opinion, in respect to his guilt or innocence, as disqualified him to act as a juror. The court decided, as matter *of fact* upon this evidence, that the juror had not expressed or formed any *fixed, settled, definite, absolute, unqualified or positive* opinion in respect to the guilt of the prisoner.

This was the finding of the judges of the Court of Oyer and Terminer upon the *issue of fact* submitted to them. This is their interpretation of the force and effect of the evidence made at the time, after hearing the testimony, and seeing the juror, and observing the temper, tone and manner in which he gave his testimony.

With the juror thus before them, I think they were much better qualified to decide this question of fact than this court can be, or any court of review. And in my opinion, their finding upon this question of fact, is, and ought to be, final and conclusive. They were a mere substitute for the triers in finding this question of fact, and confessedly there is no review of the decision of the triers when the question is submitted to them. No exception will lie upon a question of fact. The statute declares that: "On the trial of an indictment, exceptions to any decision of the court may be made by the defendant in the same cases and manner provided by law in civil

The People *v.* Stout.

cases." (2 *R. S.*, § 21, 725.) Exceptions never lie in civil cases, except for decisions upon questions of law. It is the province and duty of the court to decide the *law*, and of the jury to decide the facts, and triers stand in the place of the jury. To the decisions of the court upon the *law*, exceptions lie, but never to decisions upon the facts, or in collateral proceedings other than upon the main issue. (4 *Denio*, 21.) The exception therefore taken to the finding of the court upon the evidence upon this challenge, I think not well taken or allowable. It does not bring up that decision for review, and this court has no power or right to review such finding. (7 *Iredell*, 63 ; 2 *Dev. and Batt.*, 207.)

But if this be not so, and if this court is authorized to review the finding of the Court of Oyer and Terminer upon the question of fact, whether the prisoner established the truth of his challenge, it must do so, I think, upon the same principle that it reviews the decision of all inferior courts and officers upon questions of *fact*. It should not reverse such decision, except the finding of the Court of Oyer and Terminer was clearly against the weight of the evidence.

Upon this principle we could never sustain this exception and hold that the Court of Oyer and Terminer decided the facts erroneously, and so clearly so that it was our duty to reverse its proceedings for that cause.

But if this be not so, and we are at liberty to review the decision of the Court of Oyer and Terminer upon this question of fact, as an original question, precisely as if we were sitting in the Court of Oyer and Terminer, and occupying the place of its judges there for the trial of this challenge, then I think the challenge ought not to be sustained, and that the Court of Oyer and Terminer decided the question of fact correctly, and rightly held that Tower was a competent juror.

His testimony does not establish. that he had formed any *fixed, settled, definite, positive, absolute or unqualified* opinion in respect to the guilt or innocence of the prisoner. The juror said he had read part of the accounts in the papers, and said, "I *think* I have an *impression*," &c. This amounts to nothing.

"I *rather think* I have formed an opinion." He is not certain on this point. "I *presume* I have expressed it." He is uncertain still. "I think I retain it." This is certainly not *positive.* It is not an *absolute* opinion—*settled* and *fixed.* Then again: 'I have formed an opinion *if the accounts are true;* I rather thought they were true; so far as I read them I gave them credence." He had read part of the accounts in the newspapers. He knew of no reason to doubt them, and he gave them credence. He knew nothing of the matter personally; was doubtless an entire stranger to the prisoner, and had nothing, at best, more than a mere vague, floating, transient belief in respect to the accounts.

Then again, "I *rather* think I believe the accounts true." Why should he not? What reason had he to doubt on the subject? How could he keep his mind an entire blank, in respect to all impression, from what he read? How could any man of common sense and sensibility, and of common intelligence, refrain from having some sort of impression or opinion? "It might or it might not require evidence to remove my impression of the defendant's guilt." What less could he say? He has nothing but an impression at best. Is this a *fixed* and *positive* opinion? Far from it; it is nothing of the kind. But then he says next expressly, "I did not arrive at a *definite* opinion." Here is an explicit denial of a *definite* opinion. Judge Woodworth (in 6 *Cow.*, 564), speaking of the case of *Durell* v. *Mosher* (8 *John.*, 445), and of a juror whose fitness was questioned in that case, says: "No definite opinion was expressed or formed. The declaration was hypothetical."

It is quite apparent that this juror had nothing but a loose, vague, floating, unfixed, hypothetical opinion. Every expression throughout his evidence is guarded and careful. He does not testify like a *positive man,* hasty to judge and prompt to condemn. His language is qualified, considerate. He is obviously doubting and uncertain in regard to his own mental state and mental operations. He refers to his consciousness for his impressions, with hesitation and carefulness, and yet with an obvious purpose to conceal nothing and suppress nothing. It

The People *v.* Stout.

is obvious from his examination that he is an upright, conscientious man, who rather shrunk from serving on the jury, and would not seek the place by any concealment of his opinions or suppression of his inmost thoughts or slightest impressions. The fact that he placed credence in the newspaper statements amount to nothing. In *The People* v. *Honeyman* (3 *Denio*, 321) the court say: "If, for example, the juror has heard, or has read in a newspaper, that the prisoner is guilty of the crime laid to his charge, and has given credit to the statement, it would not be a wise or judicious act, on the part of the triers, to set aside the juror, unless they found that he had such a *settled opinion* concerning the prisoner's guilt that he could not disregard what he had read or heard out of court, and render a verdict on the evidence alone."

In *Freeman's case* (4 *Denio*, 34), Judge Beardsley, speaking of the challenge for principal cause to the juror Beach (which was quite like this case), says, "the challenge was correctly overruled." He had only an impression that the prisoner was guilty, but nothing which deserved to be called an *absolute opinion*." So here, Tower had no *absolute opinion*.

In *State* v. *Potter* (18 *Conn.*, 167), the juror was challenged for principal cause, and on his examination said he had read certain newspaper accounts in relation to the supposed murder, and among them was what purported to be the *confessions* of the prisoner. Upon hearing them read, he *was of the opinion* that, if these accounts were true, a horrid murder had been committed. The challenge was overruled, and the Supreme Court sustained the decision,—Williams, Chief Justice, saying in his opinion: "It is perfectly evident that he had no opinion upon the case itself, but he did think, if the facts were as stated in the *prisoner's confession*, a horrid murder had been committed. This is a mere hypothetical opinion;" and referred to *Durell* v. *Mosher* (8 *John.*, 347), where the juror challenged, said, "that the defendant was wrong and the plaintiff right;" but also, "that he had no personal knowledge of the matter in dispute, but that if the reports of the neighbors were correct, the defendant was wrong and the plaintiff right." The court

held the juror competent, and that his declaration was merely hypothetical.

In the case *ex parte Vermilyea*, 6 *Cowen*, 565, it is stated that Chief Justice Spencer, in a manuscript opinion referring to a case tried before him of murder, held, that "if a person had formed or expressed an opinion for or against the prisoner, *on a knowledge of any of the facts attending the murder*, or from *information of those acquainted with the facts*, he considered it a good ground of challenge, but if the opinion of the juror was formed on mere rumor or reports, he decided that such an opinion did not disqualify."

In 3 *Leigh*, 785, the Court of Appeals of Virginia say, that "a juror must have formed and expressed a *decided opinion* to be disqualified."

In 9 *Leigh*, 650, in reviewing the evidence in respect to two jurors who had heard the reports of the case, and one of them part of the evidence, the court say: "When atrocious acts are committed, they necessarily become the subject of conversation and remark, leading to impressions and opinions, favorable or unfavorable to the party accused; but when such opinions have not impressed the mind with *strong and decided convictions*, by which the *justice and fairness* of the juror's decision upon the evidence may be influenced, we think that no disqualification is produced;" and to the same effect is the current of the decisions in the Virginia courts.

But we are referred to the case of *Cancemi* (16 *N. Y. Rep.*, 504), as controlling this. In that case, the juror stated that he had formed an opinion and expressed it, and when cross-examined, said that "he had no fixed opinion—none which could not be removed by evidence."

The Court of Appeals hold, in effect, that this declaration of the juror in respect to the opinion formed, and the state of his mind, imported a *fixed opinion*, and implied a preconceived bias, which disqualified the juror. This is an authoritative decision, and binding upon the case and facts presented, but I think by no means covers this case. The juror said, "he had no opinion which might not be *removed by evidence*." But

the juror should not have an opinion that would convict without evidence was given to change it. He should start with no such opinion. The prisoner should not be required to *remove any opinion* by evidence before the juror could begin to hear the evidence impartially. So long as the evidence upon the principal challenge is directed to see, merely, whether an opinion has been formed or expressed, and the question is submitted to the court, as upon demurrer to the evidence upon such a bare naked statement of the juror, as was the case in this instance, the court must hold that such a juror is disqualified. The decision of the Court of Appeals upon the facts stated, concurs with the general current of decisions where the principal challenge is thus passed upon by the court, and I think was clearly right. But it is quite apparent that this decision involves a radical mistake and misconception in fact, in regard to this juror. His further examination on the challenge to the favor before the triers, fully discloses such mistake. Before the triers he said that "his mind was balanced; that he did not know that he had an *impression* or *opinion* that had not been removed by the former trial—the jury not being able to agree." If this evidence had been before the court on the principal challenge, it could not have held as matter of fact or law, that this was a fixed or positive opinion.

This juror obviously did not mean to say, on his examination upon the principal challenge, that he had such a *formed* opinion that he could convict without evidence, or contrary to evidence; that he had any actual bias, in point of feeling or preconceived opinion, that would interfere with the proper discharge of his duty to render a just and true verdict according to the evidence. What he doubtless really meant, if his mental operations had been analyzed, and their results more carefully stated, was that he had read the accounts of the murder in the newspapers, and from such statements he had formed the opinion that the prisoner was guilty, and that if the testimony on the trial fully sustained such reports, and there was no contradictory testimony to impeach their force, or remove the weight which they had in his mind, then he should probably remain

of the opinion formed. This would have been mere hypothetical opinion, and imported no actual bias, and involved no legal or moral disqualification of the juror (7 *Grattan*, 594; *Id.*, 607), and thus shows how unfit it is, that the challenge to a juror, that he had formed and expressed an opinion upon the guilt or innocence of the prisoner, when there is any dispute about the facts, should be half tried by the court, and in such shape as to become a question of law and form the ground for an exception, and the other half of the issue tried by the triers on the challenge to the favor. Human language is so imperfect, at best, as a representative of thought, and written language so much more liable to misrepresentation and misconstruction, when considered and reviewed by itself, remote from the time and occasion when it was used, and there is also such a liability to misunderstand or misquote a witness or juror, that it is altogether more safe and just to the juror and the cause of truth, to trust to the impression made at the time by the testimony upon those who heard it, noticed the manner, tone, appearance, and personal peculiarities of the juror while under examination, and subjected to the watchful scrutiny of the court, counsel and jury, in the court room, than to any written or reported statement of his testimony afterwards. Mr. Tower was subjected to this ordeal.

It appears that after the principal challenge was overruled he was challenged to the favor, and after other evidence offered, the arguments of the counsel, and a charge by the court, the triers found the juror indifferent. That upon such further trial, the examination of the juror, and the further evidence given, satisfied the court, the triers, and the counsel for the prisoner, that the juror was a fair, impartial and candid man, with a mind free, ingenuous and open to hear the evidence, and to allow it to have its proper weight and influence in the finding of the verdict he was required to give, I think may fairly be inferred from the finding of the triers, and the fact that the prisoner did not use his right to a peremptory challenge, and exclude the juror. I cannot think that objection or exception to the juror in such a case, upon the question of his indiffer-

ence, which is really a *single* issue, ought to go any further, if there be no exception to the charge to the triers, or that an exception to the disposition made by the court of the principal challenge, if it be allowable, should not be deemed superseded by the fuller examination and decision of the same question of fact by the triers.

In a capital case, the prisoner has twenty peremptory challenges. In the exercise of this right with that of challenges for principal cause and to the favor, a prisoner can, and virtually does, pick the jury for his trial. In a case of any degree of notoriety, a panel of one hundred jurors at least may and ordinarily will be exhausted before a jury can be impanneled.

Trial by jury is one of the noblest inventions of man for the proper administration of criminal justice, and one of the most important of the constitutional rights of every American citizen. And it is obviously of the essence of this right, that whoever is subjected to a trial upon any criminal charge, should have a *fair and impartial* jury. To secure and protect this right, to guard it with the utmost care and vigilance, is the clear duty of all courts. But in my opinion it is quite a mistake to suppose that impartial juries are most likely to be secured by rules for testing the fitness and indifference of individual jurors—so strict and artificial as to exclude from the jury box such a juror as Mr. Tower. Such rules will practically proscribe intelligence, and tend to render jury trial a virtual impracticability in the locality where high crime is committed.

I think Mr. Tower was a proper juror, and that no error was committed by the Court of Oyer and Terminer in overruling the challenge to him as such juror, and that the exception to such decision is not well taken.

Secondly. The second exception is for allowing proof of the incestuous connection between the prisoner and Mrs. Littles.

At this stage in the trial, when the evidence objected to was offered, it had been proved that the body of Charles W. Littles had been found dead in the Genesee river, on the morning of the 20th of December, 1857, and that from the appearance

of the body, the place where it was found, from the appearance of blood on the bank at a considerable distance from the body, and the condition of the slope of the bank down which the body must have fallen, it was evident that the deceased came to his death by violence committed on the bank above, from whence he had been removed to the place where he was found.

Much evidence had been given tending to show that the prisoner and Sarah Littles, the wife of the deceased, and who was jointly indicted with him for the murder, were present at the place where the crime was committed, at the time of its commission, and tending to show that they, or one of them, committed the homicide.

After such proof, the evidence in question was offered. It was objected to, and the objection was overruled, and the evidence received, to which the prisoner's counsel in due form excepted. It does not appear, from the bill of exceptions, with what view the evidence was offered, nor is it stated whether any discussion of the point took place, or upon what ground the decision to receive the testimony was put at the time by the court.

Whether it was admissible for any legitimate object or purpose, is therefore the question now presented for our consideration.

It is a fundamental rule of evidence, applicable to all trials, and to criminal trials especially, that the evidence must be confined to the point in issue. The sole object and end of evidence is to establish or disprove the disputed facts or points in issue between the parties. No evidence ought, obviously, to be received that is not adapted to that end. And it is also essential that the evidence be material and pertinent to the establishment of a material issue, and its materiality must always depend upon the subject matter to which it is directed, and the evidence should be considered and weighed, and passed upon according to its relation to such subject matter.

The first and leading point in issue on this trial was, whether the prisoner was guilty of committing the homicide in ques-

tion; and secondly, if so guilty, was the crime committed with premeditation, or without any intent to kill; whether, if the defendant was guilty of the killing, the crime was murder or manslaughter. To give character to the crime, and to show that there was design and premeditation in respect to its commission, was obviously proper. Evidence tending to show premeditation and design, was clearly within the issue, and was, in fact, evidence to prove the body of the crime. This evidence may be, and in most cases is, circumstantial. It consists in proof of such acts, declarations, and conduct on the part of the accused as afford or tend to establish a reasonable presumption of design or guilty intent.

To attempt to prove a prisoner guilty of one crime by proving him guilty of another, would be clearly inadmissible.

Nothing is more palpable than that it would be the height of injustice to infer the guilt of a person of one felony for which he was on trial, by proving him guilty of some other distinct crime.

The prisoner and Mrs. Littles were brother and sister, and sexual intercourse between them would be incest, and this would be a high criminal offence, punishable in the State prison for the term of ten years. (2 *R. S.*, 773, § 12.)

Proof of this crime committed by them, has obviously no necessary connection with the crime of murder, for which the prisoner was indicted, and was clearly not admissible upon any such principle.

When several felonies are connected together as parts of one scheme or plot, like the different acts in a drama, and all tend to a common end, then they may be given in evidence to show the process of motive and design in the final crime. In such case, the several crimes are part of a chain of cause and consequence, so linked together as to be necessarily provable as several parts of the same act or crime. (17 *Alaba.*, 618, 625 2 *Id.*, 229; 4 *C. & P.*, 221; 19 *Eng. C. L. R.*, 354; 1 *Leigh*, 514; 4 *Humph.*, 27; *Roscoe Cr. Ev.*, 81; *Burrill Cr. Ev.*, 290.) The ground upon which this evidence was offered and received

and was claimed to have been admissible, is now claimed to be to prove motive.

The prisoner had committed adultery with the wife of the deceased, and he had committed incest with his sister. The husband might avenge the wrong. He might expose the common crime of the prisoner and his sister, and seek to bring them to punishment for their crime. His knowledge of the crime, and his ability by his own evidence to convict them of its commission, and cause the prisoner to be sent to the State prison for a long period of his life, it is supposed may have constituted a strong motive with him and Mrs. Littles for the commission of the murder.

I cannot see why this is not so, and why the evidence was not proper for the consideration of the jury. It seems to me that it bears clearly upon the question at issue. Did the prisoner commit the crime? Had he any *motive* to do so? The relevancy of evidence depends upon the nature and circumstance of the particular case. Whatever fact tends legitimately and fairly, according to the ordinary operation of the human mind, and the ordinary principle of human conduct, to show *motive*, may properly be given in evidence, in proof of any assumed motive for the commission of crime.

If the prisoner and Mrs. Littles had not been brother and sister, so that they could not inter-marry, no doubt, I think, would have existed on the point. In such case, I think it would have been quite apparent that a sufficient motive would have existed in the case, and that it was proper to show a criminal intimacy between them. It would have been apparent in such case that they might have a motive to get rid of the husband, that they might more safely continue their criminal intercourse. But if they were vile enough to be guilty of incestuous connection, and that, as it appears, more or less openly, grossly and continuously, why might they not desire to get the husband out of the way for greater security? The affections of the wife towards her husband were obviously gone. She desired, in June previously, to take measures for a divorce. To get rid of him was evidently an object of desire

with her, and after her brother, the prisoner, came into close intimacy with her, and certainly after the incestuous intimacy had been discovered, it is very likely that they formed the common purpose to get him out of the way, and had a strong motive for such minds so to do. At least it was, to my mind, a very proper matter for the consideration of the jury on the main issue, both as to the fact of killing, and as to the premeditation with which it was claimed to have been done.

In *State* v. *Watkins* (9 *Conn.*, 47), the prisoner was indicted for killing his wife, and on the trial the court allowed the People to prove that he had had an adulterous connection with another woman. This was held to be proper by the Supreme Court of that State, and is a case quite in point.

If in this case it had been supposed that the purpose of the husband was to get rid of his wife, that he might marry the woman with whom he had had criminal intercourse, the proof of their intimacy might obviously have been given as a motive for the murder.

In *Rex* v. *Clewes* (4 *Car. & P.*, 221; 19 *Eng. Com. Law*, 354), proof of a previous murder was allowed to be given in evidence for the purpose of showing motive for the commission of the second murder, for which the prisoner was on trial, it being alleged that the motive to the second murder was, by killing the witness, to destroy all evidence by which the prisoner might be connected with, or convicted of the former offence.

In *Dunn* v. *The State* (2 *Ark.*, 229), proof of a previous murder was permitted to be given in evidence to show motive, it appearing that the person killed, and for which murder the prisoner was on trial, had been making inquiries and seeking to detect the person guilty of the former murder.

It is impossible to define by any rule, or put limits upon the facts that may be given in evidence in proof of motive, except that they must relate to the subject matter, and be rationally adapted to establish the fact in issue. It is not necessary that the connection be so intimate as that the proof of one fact un-

avoidably involves or draws after it the other, as a legitimate and necessary consequence from an appropriate cause. It is sufficient if the evidence fairly tends to prove the assumed motive, and the jury may rationally and properly imply the motive from the act sought to be given in evidence. (*State* v. *Baalam*, 1 *Starkie Ev.*, 502 ; 1 *Ala.*, 451.)

So various are the motives which govern men, and so indefinable that every case must necessarily be governed by its own particular circumstances. As various as are the objects of ambition, passion or desire among men, so various may be the machinations and motives to crime, and so various must necessarily be the kind and species of evidence adapted, and proper to be received, to explain the motives and principles of human conduct, to unravel and reveal the webs and wiles of criminal purpose, and bring the offenders to justice.

I think no error was committed in receiving the evidence in question, and that the exception to its reception is not well taken.

The counsel for the prisoner makes another point: That the court cannot consider or weigh the question whether the prisoner be guilty of the crime charged. If errors have been committed, the judgment must be reversed and a new trial awarded. This is clearly so, and I agree with that point entirely.

If any substantial error has been committed, even though we are fully satisfied of the prisoner's guilt, and that a new trial would probably result in the same verdict, it would be our duty to grant a new trial. I fully agree with the remark of Judge Selden, in the case of *The People* v. *McMahon* (15 *N. Y. Reports*, 397), that "however clear the proof of the prisoner's guilt in this case may be, it is better that the People be put to the trouble of establishing it upon a second trial, than that the force of a salutary rule, upon which life may often depend, should be impaired."

But while this is true, it is obviously due to the public interest and to the faithful administration of public justice, that courts

The People *v.* Stout.

of review should not reverse the proceedings of inferior courts upon slight and trivial grounds.

In this case, upon the whole, I am clearly of the opinion that no material error was committed by the court below, and having no doubt in respect to the justice and propriety of the verdict, it is our duty not to interfere with it, but leave the law to take its course.

The judgment of the Court of Oyer and Terminer should be affirmed.

Judgment affirmed.